[No. B073235. Second Dist., Div. Three. June 30, 1995.]

WILHELMINA B. PRUYN, Plaintiff and Appellant, v. AGRICULTURAL INSURANCE COMPANY et al., Defendants and Respondents.

**COUNSEL**

Perona, Langer & Beck, Ronald Beck and Ellen R. Serbin for Plaintiff and Appellant.

Zimmerman & Kahanowitch, Brian F. Zimmerman, Robert Cohen, Dee-Ann Jenkins, Knapp, Petersen & Clarke, Cynthia A. Trangsrud, JoAnn Montoya, Federman, Gridley, Gradwohl & Flaherty, Lawrence B. Haile, Black,

508

Compean, Hall & Lenneman, Michael D. Compean, Tricia A. McCarthy, Kirtland & Packard, Robert A. Muhlbach, Garland O. Bell, Wilson, Kenna & Borys, Garth Goldberg, Sedgwick, Detert, Moran & Arnold, Alan J. Freisleben, Todd A. Picker, Haight, Brown & Bonesteel, Roy G.Weatherup, Michael J. Leahy, Jon M. Kasimov, Hillsinger & Costanzo, John H. Walsh and Timothy M. Twomey for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—Plaintiff and appellant Wilhelmina B. Pruyn (plaintiff) appeals from a judgment which dismissed her complaint brought against multiple insurance companies under the "direct action" provisions of the Insurance Code. (Ins. Code, § 11580, subd. (b)(2).)[1] The trial court sustained the objections to plaintiff's pleading by the defendant and respondent insurers[2] without leave to amend.

---

[1]Insurance Code section 11580 provides in pertinent part:

"A policy insuring against losses set forth in subdivision (a) shall not be issued or delivered to any person in this state unless it contains the provisions set forth in subdivision (b). Such policy, whether or not actually containing such provisions, shall be construed as if such provisions were embodied therein.

". . . . . . . . . . . . . . . .

"(b) Such policy shall not be thus issued or delivered to any person in this state unless it contains all the following provisions:

". . . . . . . . . . . . . . . .

"(2) A provision that whenever judgment is secured against the insured or the executor or administrator of a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

This provision, by its terms, authorizes the judgment creditor to bring a direct action on a judgment, such as the one involved in this case, which is based upon property damage. One of the defendant insurers has advanced the argument that a direct action by a third party claimant to enforce a judgment based upon property damage should be limited by this section to cases involving property damage caused by vehicles or draught animals. Such language is contained in subdivision (a) of section 11580, but it refers to the types of policies in which the mandatory provisions described in subdivision (b) *must* be included. It does not limit enforcement of such language if it is actually included in a policy whether or not it was statutorily required. There is no claim that the policies in this case do not contain these provisions and we see no reason not to enforce them. Moreover, as we explain, plaintiff has alleged an assignment of all rights of the insured and thus would, in any event, upon proper allegations and proof, be entitled to pursue an action against the insurers on her judgment subject to a resolution of the issues presented by this appeal.

[2]There are 10 insurance company defendants and respondents which have filed briefs in this appeal. They are: (1) Central Mutual Insurance Company, (2) Jefferson Insurance Company, (3) Covenant Mutual Insurance Company, (4) Landmark Insurance Company, (5) Chicago Insurance Company, (6) Stonewall Insurance Company, (7) RLI Insurance Company, (8) Transcontinental Insurance Company, (9) Fireman's Fund Insurance Company, and (10) Topa Insurance Company, formerly known as Universal Security Insurance Company. There were four additional insurers named as defendants in plaintiff's complaint but which

Plaintiff filed this action against the defendant insurers to enforce a stipulated judgment entered in her favor after she had settled a claim for damages which she had previously asserted in the underlying action against the insured Rolling Hills Community Association of Rancho Palos Verdes (RHCA). The settlement included a covenant not to execute on the judgment against RHCA. The defendant insurers contend that such a judgment may not be enforced against them as a matter of law.

■ We disagree and hold that when, as plaintiff alleges happened here, a liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the existence and amount of the insured's liability. The effect of such presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion. If the insurer is unable to meet that burden of proof then the stipulated judgment will be binding on the insurer and the policy provision proscribing a direct action against an insurer except upon a judgment against the insured after an "actual trial" will not bar enforcement of the judgment.

As plaintiff has alleged such facts, or claims that she can do so, it was error for the trial court to sustain the pleading objections of the defendant insurers without leave to amend and to dismiss plaintiff's complaint.

### FACTUAL AND PROCEDURAL BACKGROUND[3]

Prior to June 1987, plaintiff owned a home in the City of Rolling Hills. Unfortunately, her home was located adjacent to that part of the Palos Verdes Peninsula, known as the "Flying Triangle," which was threatened by an ancient landslide.

Land movement in the Flying Triangle area began in approximately 1972. However, it was not discovered until early in 1980 when a landslide manifested itself. Over time, this land movement substantially affected plaintiff's property, causing it to move, buckle, split, crack and subside; in addition, her

have not appeared in this appeal: Agricultural Insurance Company, Travelers Insurance Company, Maine Bonding and Casualty Company and CNA Insurance Company. Plaintiff dismissed Agricultural Insurance on December 4, 1992. The 14 insurers are collectively referred to as the "defendant insurers."

[3]As this case comes to us after a successful challenge to plaintiff's pleadings by demurrer (or judgment on the pleadings) we accept as true the material facts alleged in her complaint.

property also sustained a loss of lateral support. RHCA, a private homeowners association, owned, controlled and maintained all of the common areas surrounding plaintiff's home including roads, drains, canyons and water channels. Rather than attempt to repair the damage to her property, plaintiff sold her home in 1987 at a price which was substantially below the amount it would have commanded had the property not been damaged.

A few months later, on April 13, 1988, plaintiff filed an action for damages against RHCA.[4] In her complaint, she alleged causes of action for (1) diversion of surface water, (2) negligence, (3) nuisance, (4) breach of contract, (5) breach of fiduciary duty, and (6) inverse condemnation. The gravamen of her complaint was that RHCA and others had negligently constructed, maintained and operated roads, drainage, channels and culverts and had allowed water to enter and erode canyons within the Flying Triangle area. Plaintiff alleged that RHCA's negligence and that of its employees and agents was responsible for the damage to plaintiff's property and for her loss of its use.

RHCA was served with plaintiff's complaint in March of 1990 and tendered defense of the action to each of the defendant insurers. Over a period of years, including the period relevant to the RHCA actions described in plaintiff's complaint, RHCA had been insured by several insurers which provided both primary and excess liability coverage.[5] Plaintiff's action was tendered to the defendant insurers but each of them denied coverage and refused to provide a defense to RHCA.[6]

---

[4]Plaintiff also named as defendants in her complaint, California Water Service, a corporation, and 100 Doe defendants.

[5]Plaintiff's complaint alleges that defendant insurers Central Mutual, Agricultural, Jefferson, Covenant Mutual, Travelers, Landmark and Chicago Insurance Companies provided primary coverage. The other defendant insurers provided excess coverage in varying amounts and upon varying conditions. This circumstance may present plaintiff with some problems on remand. She merely has alleged in conclusionary fashion that all of the defendant insurers had "a duty to defend and/or indemnify" RHCA without specifying when, how or in what manner any such obligation on the part of the excess insurers ever arose (see fns. 14 and 28, *post*). While sufficient to overcome a general demurrer, such allegations may be tested on a motion for summary judgment or adjudication. Plaintiff's general allegations also mask another difficulty in this case. We refer to the question of coverage under some of the policies. Plaintiff's allegations encompass the six-year period before either the land movement itself, or any damage caused thereby, had been discovered. This raises serious coverage trigger issues which are beyond the scope of this opinion. They will likewise have to be dealt with upon remand. (See generally *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 897 P.2d 1].)

[6]The record does not disclose the reason(s) why all of RHCA insurers denied coverage. However, one of the insurers argues here that diminution in value is not "property damage" and therefore plaintiff's claim against RHCA would not be covered in any event. While it is true that there are cases holding that a "diminution in market value" is not a covered peril

Left without a defense from its liability insurers, and having already defended and settled (for $4 million) separate litigation on these same claims involving other homeowner claimants,[7] RHCA entered into negotiations with plaintiff to settle her case without a trial. The settlement which was reached provided that RHCA would stipulate to a judgment in the amount of $650,000 and give an assignment of its rights against the defendant insurers in exchange for plaintiff's covenant not to execute on the judgment against RHCA. Indeed, the settlement agreement included plaintiff's express recognition that "no monies shall be paid by RHCA as a result of [plaintiff's claim]." In the agreement, RHCA conceded liability and agreed that any potential judgment could have been substantially in excess of the $650,000 settlement.[8] With respect to the assignment of its rights against the insurers, RHCA agreed that such assignment included any right of action founded upon a ". . . breach of duty to defend, breach of duty to indemnify, breach of contract, [and] any and all rights to satisfaction of any judgment in [an action] under any contract of insurance."

---

(*Hoffman* v. *State Farm Fire & Casualty Co.* (1993) 16 Cal.App.4th 184, 190 [19 Cal.Rptr.2d 809]; *State Farm Fire & Casualty Co.* v. *Superior Court* (1989) 215 Cal.App.3d 1435, 1444 [264 Cal.Rptr. 269]), they do not support the argument that plaintiff failed to assert a claim for "property damage" as that term is used in the defendant insurers' liability policies. They are first party cases and thus not necessarily relevant to questions of coverage under a liability policy. In the liability policy context, diminution in market value is accepted as a proper *method of measurement* of any property damages which may have been sustained. (*Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 565 [334 P.2d 881]; *Eichler Homes Inc.* v. *Underwriters at Lloyds, London* (1965) 238 Cal.App.2d 532, 538 [47 Cal.Rptr. 843].)

[7]On December 22, 1987, over two years before RHCA was served with plaintiff's complaint in March of 1990, it settled major consolidated litigation in which it had been sued for damages arising from the land movement in the Flying Triangle area. This settlement, in which RHCA agreed to pay a total of $4 million, and which the court found to be in good faith, was made in the midst of trial, indeed while the jury was deliberating the liability of RHCA and its codefendants. Plaintiff has requested that we take judicial notice of that certain action in the Los Angeles Superior Court in which, by special jury verdicts returned on January 7, 1988, RHCA was found to be responsible for 17.5 percent of the damages as to 17 out of 22 plaintiff groups and 10 percent as to the other 5. This case involved the same claims of negligence as have been asserted in plaintiff's complaint. That action is entitled Evans v. City of Rolling Hills (Super. Ct. L.A. County, No. SWC 58716, consolidated with Nos. SWC 60946, SWC 61010, SWC 69571, SWC 60093, SWC 60966 and SWC 66601). We have granted that request.

[8]The record reflects the existence of evidence which, if received and believed, establishes that plaintiff's home would have had a fair market value, *without regard to the effects of the landslide*, of $3 million as of February 1990. Plaintiff sold the home in May of 1987 for $900,000 which presumably was substantially less than its then fair market value. Again, we assume for purposes of this opinion that the sale and such reduced price were caused, at least in some part, by existing or anticipated problems created by the landslide condition in the Flying Triangle.

Plaintiff, joined by RHCA, filed a motion for an order determining the settlement to be in good faith. (Code Civ. Proc., § 877.6.)[9] A copy of the motion was served upon each of the defendant insurers.[10] However, none of the insurers responded or appeared to oppose the motion. On January 11, 1991, the motion was heard by the Hon. Frank Baffa, the same judge who had spent nearly a year trying the Evans case which had resulted in a jury determination of RHCA's liability for these same alleged acts of negligence. (See fn. 7, *ante*.) Judge Baffa granted plaintiff's motion.[11] A stipulation for judgment in the sum of $650,000 was signed and the judgment was entered on February 22, 1991.

On February 14, 1992, plaintiff filed the instant action in which she seeks to enforce the stipulated judgment against the several insurers pursuant to Insurance Code section 11580, subdivision (b)(2). The defendant insurers responded variously with demurrers and motions for judgment on the pleadings. Without going into unnecessary procedural details, the insurers asserted two principal legal objections to plaintiff's complaint: a stipulated judgment against the insured, coupled with a covenant not to execute, (1) is not binding upon an insurer who has not consented thereto and (2) does not result in a determination of the amount of the insured's obligation after an "actual trial" as required by the "no action" clause in the several liability policies.[12]

The trial court, in making its ruling in favor of the defendant insurers, was obviously concerned about the potential for fraud and collusion between plaintiff and RHCA; however, because it also perceived some confusion and

[9]It is not clear from the record before us whether there were other nonsettling defendants who were involved in this proceeding or the motion was simply intended to provide a judicial forum for a determination that the settlement was free from fraud or collusion.

[10]We note, however, the record reflects that at least one of the insurers claims that it received no such notice.

[11]The record on appeal does not reflect, by transcript or otherwise, just what transpired at the hearing on plaintiff's good faith motion. All that plaintiff's complaint states is that Judge Baffa granted the motion. A minute order, dated January 11, 1991, reads: "Proceedings are held re good faith settlement motion. The Court has read and considered all documents. The Court finds the settlement was made in good faith." The court then sealed all of the good faith settlement documents and they have not been provided to us for review.

[12]As mandated by Insurance Code section 11580, subdivision (b) (see fn. 1, *ante*), each of the policies issued to RHCA includes a so-called "no action" clause which provides, in relevant part: "No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, *nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial* or by written agreement of the insured, the claimant and the company." (Italics added.) While such policy language does not precisely track Insurance Code section 11580, subdivision (b), it has been held that it neither defeats the statutory purpose nor does it conflict therewith and is therefore enforceable. (*Rose* v. *Royal Ins. Co.* (1991) 2 Cal.App.4th 709, 715-716 [3 Cal.Rptr.2d 483].)

conflict in the appellate decisions, the trial court decided to expedite an appellate resolution of the issues raised by sustaining the insurers' objections.[13] The insurers' pleading objections were all sustained without leave to amend and a judgment of dismissal was entered. This timely appeal followed.

## ISSUE PRESENTED

This case presents two important questions with respect to the consequences of a liability insurer's wrongful denial of coverage or refusal to provide a defense. Where an insured, wrongfully abandoned by his or her liability insurer, enters into a settlement with the third party claimant in order to bring the underlying litigation to an end on the best possible terms and the settlement is manifested by a stipulation for judgment accompanied by a covenant not to execute, (1) under what circumstances can such judgment be enforced against the insurer and (2) what impact, if any, will the policy's "no action" clause have on any suit against the insurer?

## DISCUSSION

### 1. *Standard of Review*

■ In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] . . . [W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Given this standard of review, we necessarily accept as the foundation of this opinion that there was at least a potential for coverage under each of the

---

[13]At the hearing on the initial demurrer filed by two of the insurers the trial court expressed its views in the following terms: "I could take this under submission and try to write a very scholarly 60-page opinion analyzing all of the cases and I'm sure it would still go up on appeal because it's an important issue and it should go up on appeal, so without wasting a lot of time in this Department, I'm going to sustain the demurrer in each case without leave to amend and let's let the Court of Appeal give us some guidance on this issue." Thereafter, similar rulings were made in favor of the remaining defendant insurers.

primary policies and that those insurers owed to RHCA a defense to plaintiff's action. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295-296, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)[14] It appears that plaintiff has alleged sufficient facts which, if proven, would establish a basis for coverage under at least some of the several primary policies and that those insurers' refusal to provide a defense was wrongful. We necessarily acknowledge that plaintiff's ultimate recovery against the insurers will depend upon it being established that there was coverage and that the insurers, or at least some of them, were obligated to indemnify RHCA under their respective policies. Absent such an obligation, any recovery by plaintiff, based solely on a wrongful failure to defend RHCA, may be limited to the costs of defense.[15] However, those are all matters for pleading and proof at trial. In light of our acceptance of the truth of the allegation that coverage does exist, we limit our focus to the question of plaintiff's right to recover on her *stipulated* judgment in a direct action pursuant to Insurance Code section 11580, subdivision (b)(2).

## 2. *The Consequences of an Insurer's Wrongful Refusal to Provide a Defense*

■ "An insurance company 'bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the

---

[14]We are mindful of the fact that approximately one-half of the defendant insurers provided only excess coverage and that their duty to provide a defense to RHCA would not even arise until there had been exhaustion of the primary insurers' obligations to which they are excess. (See fn. 28, *post.*)

[15]One of the consequences of an insurer's wrongful failure to defend is that it may be bound, in a subsequent suit to enforce the policy (or in a direct action under Ins. Code, § 11580), by the express or implied resolution in the underlying action of the factual matters upon which coverage turns. (*Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 565 [91 Cal.Rptr. 153, 476 P.2d 825].) If it is not clear from the verdict in the underlying action on what theory the judgment was rendered against the insured, the insurer cannot thereby escape liability for that judgment simply because it was not *necessarily* based on a theory within the coverage of the policy. Applying the principle that to require an insured to show the extent of the loss caused by an insurer's breach would impose an impossible burden on the insured, the *Hogan* court stated (in a characterization of the decision in *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168]), ". . . the insurer [which wrongfully fails to defend] is liable [for the amount of the judgment against its insured] whenever the trial in the underlying action involved a theory of recovery within the coverage of the policy and it was not clear whether the jury's verdict was based upon that theory." (3 Cal.3d at p. 566.) However, where the issues upon which coverage depends are not raised or necessarily adjudicated in the underlying action, then the insurer is free to litigate those issues in the subsequent action and present any defenses not inconsistent with the judgment against its insured. (*Id.* at pp. 564-565; *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co., supra,* 51 Cal.2d at pp. 561-562.) If, in that subsequent action, it is determined that there was no coverage, then the measure of damages for a wrongful failure to defend would be limited to the costs and attorney fees expended by the insured in defending the underlying action. (*Amato* v. *Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1793-1794 [23 Cal.Rptr.2d 73].)

policy' [Citation.] Wrongful failure to provide coverage or defend a claim is a breach of contract. [Citations.]" (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297].) An "insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability. As a consequence, California courts have been consistently solicitous of insureds' expectations on this score. [Citations.]" (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at pp. 295-296.)

■ It is the general rule that a liability " 'insurer who has had an opportunity to defend [the underlying action brought against its insured] is bound by the judgment against its insured as to all issues which were litigated in the action. . . .' [Citation.] The operation of this rule . . . 'depends primarily upon notice to the insurer of the pendency of the action.' [Citation.]" (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 884 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Geddes & Smith, Inc.* v. *St. Paul Mercury Indemnity Co., supra,* 51 Cal.2d at p. 561.) Courts have for some time accepted the principle that an insured who is abandoned by its liability insurer is free to make the best settlement possible with the third party claimant, including a stipulated judgment with a covenant not to execute. Provided that such settlement is not unreasonable and is free from fraud or collusion, the insurer will be bound thereby. (*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240-242 [178 Cal.Rptr. 343, 636 P.2d 32]; *Zander* v. *Texaco, Inc.* (1968) 259 Cal.App.2d 793, 802 [66 Cal.Rptr. 561].)

■ If an insurer, with notice of the pendency of the underlying action, wrongfully denies coverage or improperly refuses to provide its insured with a defense, then " 'the insured is entitled to make a reasonable settlement of the claim in good faith and . . . then maintain an action against the insurer to recover the amount of the settlement . . . .' [Citation.]" *Isaacson* v. *California Ins. Guarantee Assn., supra,* 44 Cal.3d at p. 791.) In a later reimbursement action against the insurer, based upon a breach of the contractual obligation to provide a defense, "a reasonable settlement made by the insured to terminate the underlying claim . . . may be used as *presumptive evidence* of [1] the insured's liability on the underlying claim, and [2] the amount of such liability. [Citations.]" (*Ibid.,* italics added; see also *Clark* v. *Bellefonte Ins. Co.* (1980) 113 Cal.App.3d 326, 335 [169 Cal.Rptr. 832]; *Kershaw* v. *Maryland Casualty Co.* (1959) 172 Cal.App.2d 248, 256-257 [342 P.2d 72]; *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 631-632 [40 P.2d 311].)

■ Of course, where the insurer has fulfilled its contractual obligation to provide a defense to the underlying action, a settlement of that action by the

insured without the consent of the insurer will have entirely different consequences. First, such a settlement would probably breach the policy's "cooperation" clause and give the insurer a defense to an action on the policy if prejudice could be shown. (*Hall* v. *Travelers Ins. Companies* (1971) 15 Cal.App.3d 304, 308 [93 Cal.Rptr. 159].) Second, the standard "no action" clause, such as exists in the policy before us (see fn. 12, *ante*), will preclude any recovery by the insured of amounts which may have been paid to the claimants. (*Clark* v. *Bellefonte Ins. Co.*, *supra*, 113 Cal.App.3d at p. 336.) As one court put it, ". . . where an insurer provided a defense to its insured in the underlying litigation, and the insured, without the participation or the consent of the insurer, stipulated to a judgment without evidentiary support and with no potential for personal loss, such judgment is insufficient to impose liability on the insurer in a later action against the insurer under section 11580. To hold otherwise would create in the insured the ability to escape all liability for his or her own wrongdoing while imposing on the insurer totally unsupported liability. The potential for fraud and collusion is evident." (*Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1024 [14 Cal.Rptr.2d 588], fn. omitted.)

In this case, however, we are presented with the question of the liability of insurers which have allegedly wrongfully refused to provide a defense and the insured, left to fend for itself, has settled the underlying action. The insured, as an integral part of that settlement, stipulated to a judgment in the agreed settlement amount in exchange for a covenant not to execute and assigned its rights against its insurers to the plaintiff claimant. Thus, it is the plaintiff, not the insured, who is seeking to recover the amount of the settlement. The questions presented to us are (1) to what extent is the insurer bound by such settlement and (2) can the stipulated judgment be enforced against the insurer in spite of the "no action" clause?

Courts have reached differing results on these issues depending upon the following two factors: (1) whether or not the insurer provided a defense to the insured and (2) the nature and extent of judicial oversight of, or participation in, the settlement process so as to give some assurance that there was no fraud and collusion in the making of the settlement.

### 3. *Judicial Participation Sufficient to Bind Insurer in Direct Action by Third Party Judgment Creditor*

■ In order to bring a direct action against an insurer under Insurance Code section 11580, the third party judgment creditor must have obtained a final judgment against the insured. However, a number of cases have held that such judgment need not be based on a contested or adversarial trial, but may rest upon a default hearing held following a settlement (*National*

*Union Fire Ins. Co.* v. *Lynette. C.* (1994) 27 Cal.App.4th 1434, 1449 [33 Cal.Rptr.2d 496]; see also *Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at pp. 884-886; *Zander* v. *Texaco Inc.*, *supra*, 259 Cal.App.2d at pp. 799, 804-806) or an uncontested trial where the insured settled with the claimant and thereafter presented no defense. (*Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d at pp. 228, 236-242.) These circumstances necessarily involve significant independent adjudicatory action by the court, thus mitigating the risk of a fraudulent or collusive settlement between an insured and the claimant. Final judgments entered under either of these circumstances are binding on the insurer which has wrongfully abandoned its insured and may be enforced directly under Insurance Code section 11580.

There is a sound reason why this should be so. The insurer not only had a right to participate in and to control the litigation, it had a duty to do so. An insurer which has wrongfully abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment merely because the default or uncontested proceedings followed, and were related to, an agreement between the insured and the claimant. Whatever the terms of the settlement, the entry of judgment was based on an independent review and adjudication of the evidence by the trial court. An insurer which has breached its contract is properly bound by the result of such trial proceedings and will not be heard to raise the policy's "no action" clause in defense. (*National Union Fire Ins. Co.* v. *Lynette C.*, *supra*, 27 Cal.App.4th 1434, 1444-1453.)[16]

■ As the *National Union* court put it, "[I]t is apparent that a trial does not have to be adversarial to be considered an 'actual trial' under the 'no action' clause, or to be considered binding against the insurer in a section 11580 proceeding. [Citation.] In deciding whether a judgment involving the injured party and the insured is binding on the insurer, courts focus on whether the facts have been adjudicated independently in a process that does not create the potential for abuse, fraud or collusion. This concern is heightened when the injured party provides the insured with a covenant not to execute. From this distillation, we conclude that the term 'actual trial' in the standard 'no action' clause has two components: (1) an independent adjudication of facts based on an evidentiary showing; and (2) a process that does not create the potential for abuse, fraud or collusion." (*National Union Fire Ins. Co.* v. *Lynette C.*, *supra*, 27 Cal.App.4th at p. 1449.)

However, in the case at bench, the only judicial participation was a good faith determination made pursuant to Code of Civil Procedure section 877.6

---

[16]We exclude, of course, those trial proceedings which are clearly a patent sham collusively designed to create a judgment for which liability insurance coverage would then exist. (See, e.g., *Lipson* v. *Jordache Enterprises, Inc.* (1992) 9 Cal.App.4th 151, 154-156 [11 Cal.Rptr.2d 271].)

(section 877.6). As we now discuss, this factual distinction is important and compels a different result.

### 4. *Judicial Participation Under Section 877.6 Is Not Sufficient to Bind Insurer*

#### a. *Stipulated Judgment With a Covenant Not to Execute*

To be sure, a stipulated or consent judgment which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion. "With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insured's best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages." (*Wright* v. *Fireman's Fund Ins. Companies, supra,* 11 Cal.App.4th at p. 1023.) Given the accuracy of these observations, a stipulated judgment should only bind an insurer under circumstances which protect against the potential for fraud and collusion.

However, most of the cases which have dealt with this problem, and have found that a *stipulated* judgment was not binding on the insurer, have been cases where the insurer had not abandoned the insured, but rather had provided a defense and had refused to consent to the settlement. (*Wright* v. *Fireman's Fund Ins. Companies, supra,* 11 Cal.App.4th at pp. 1018-1020; *Rose* v. *Royal Ins. Co., supra,* 2 Cal.App.4th at pp. 717-718; *Studley* v. *Benicia Unified Sch. Dist.* (1991) 230 Cal.App.3d 454, 460 [281 Cal.Rptr. 631]; *State Farm Fire & Cas. Co.* v. *Byrd* (N.D.Cal. 1990) 729 F.Supp. 1265, 1267, affd. *State Farm Fire & Cas. Co.* v. *Engstrom* (9th Cir. 1991) 933 F.2d 772.) Or, as the *Wright* court put it, "All of the cases in which a judgment . . . has been found binding on the insurer were based on the principle [that] an insurer who has an opportunity to defend and *wrongfully* fails to do so is liable on the judgment against the insured. [Citations.]" (*Wright, supra,* 11 Cal.App.4th at p. 1019, italics added.)[17] On the other hand, several of the cases where the insurer has wrongfully repudiated its obligation to defend, and the settlement and stipulated judgment were enforced against the insurer, also involved significant judicial participation which served to protect against fraud and collusion. (*Zander* v. *Texaco, Inc., supra,* 259 Cal.App.2d at pp. 804-806; see also *Samson* v. *Transamerica Ins. Co., supra,* 30 Cal.3d at pp. 228, 236-242; *Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at pp. 884-886.)

---

[17]The same court which decided *Rose* v. *Royal Ins. Co., supra,* 2 Cal.App.4th 709, subsequently suggested that its conclusion that the insurer was not bound by a stipulated judgment might not apply if the insurer had failed to provide a defense to the insured. (*Pacific Estates, Inc.* v. *Superior Court* (1993) 13 Cal.App.4th 1561, 1568, fn. 6 [17 Cal.Rptr.2d 434].)

The first case to really present the question of the enforceability of a stipulated judgment agreed to by an abandoned insured but *without* any judicial participation is the one on which the defendant insurers principally rely. It is *Smith* v. *State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104 [7 Cal.Rptr.2d 131], where the insurer did refuse a defense but the court nonetheless found that the stipulated judgment entered into between the insured and the claimant was *not* binding on the insurer. Based on *Smith*, the insurers argue that a stipulated judgment which is accompanied by a covenant not to execute will not bind an insurer under Civil Code section 2778, subdivision 5[18] and therefore is unenforceable. While we agree that such a judgment, standing alone, cannot bind the insurer, that is the beginning of the discussion, not the end.

*Smith* involved an attempt to pursue an assigned bad faith claim based on a stipulated judgment and a covenant not to execute which shielded the insured from any liability. The court expressed the obvious concern that to sanction such a transaction between an injured party and the insured would invite collusion and the bootstrapping of unsupportable damage claims well in excess of policy limits. Although *Smith* involved the validity of an assignment by the insured of rights against the insurer, the applicable principles are the same as those which control this case. "Whether an action is brought pursuant to assignment or section 11580, the same potential for abuse arises in binding an insurer to a stipulation in which it did not participate or to which it did not consent." (*Wright* v. *Fireman's Fund Ins. Companies, supra,* 11 Cal.App.4th at p. 1023.)

The *Smith* court held that the policy considerations outlined in *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 800-804 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142], disapproved on other grounds in *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173], which justified a prejudgment assignment of the insured's rights to the claimant,[19] were overcome by three policy considerations which support *disallowance* of

---

[18]Civil Code section 2778, subdivision 5 provides: "If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former."

[19]The *Critz* court emphasized that its recognition of a prejudgment assignment was justified by two factors: (1) the public interest in encouraging settlements; and (2) fairness; that is, the equalization of the strategic advantages between the insurer and insured. If the insurer knows that a rejection of an offer to settle within policy limits may well lead to an assignment of the insured's rights to the claimant, then it will weigh the offer more seriously and give greater consideration to the rights of the insured. Thus, a limitation on the insured's right of assignment would discourage rather encourage settlements. With respect to fairness, it is true that an insured has a contractual duty of cooperation. However, that obligation is not breached by an assignment of the insured's rights to the claimant after the insurer has breached its obligation to settle in good faith. The insurer, by that act, exposes the insured to the risk of personal liability. As the *Critz* court put it, "At that point, there is an acute change in the

such assignments: (1) Evidence Code section 1155 prohibits evidence of insurance in actions to recover damages for personal injuries, (2) an insured's liability cannot realistically be litigated in an adversarial manner since the insured (who has settled with the claimant) is placed in the position of being the ally of the claimant, and (3) such a prejudgment assignment is particularly unfair to excess insurers. (*Smith* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 5 Cal.App.4th at pp. 1112-1113.) Therefore, the *Smith* court concluded that either a judgment, or payment by the insured of the settlement,[20] was a condition precedent to the right of an insured to assign a bad faith claim against the insurer.

We agree with the comment in *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132 [29 Cal.Rptr.2d 559], that such a rule is too rigid. (*Id.* at p. 1153.) "The countervailing policy concerns explored in *Critz*, namely, those in favor of settlement and equalization of insured's and insurer's strategic advantages, are also important. Each case develops its own dynamic and has its own mix of procedures and circumstances which should be evaluated to determine whether the problems of collusion and prejudice are substantially diminished in that case." (*Id.* at p. 1154.) In the context of this case, reliance on *Smith* to justify the dismissal of plaintiff's complaint fails to recognize the procedural consequences of the application of *Isaacson's* presumptive evidence rule. The concerns expressed in *Smith*

relationship between policyholder and insurer. The change does not or should not affect the policyholder's obligation to appear as defendant and to testify to the truth. He need not indulge in financial masochism, however. Whatever may be his obligation to the carrier, it does not demand that he bare his breast to the continued danger of personal liability. By executing the assignment, he attempts only to shield himself from the danger to which the company has exposed him. He is doubtless less friendly to his insurer than he might otherwise have been. The absence of cordiality is attributable not to the assignment, but to his fear that the insurer has callously exposed him to extensive personal liability. The insurer's breach so narrows the policyholder's duty of cooperation that the self-protective assignment does not violate it." (*Critz* v. *Farmers Ins. Group*, *supra*, 230 Cal.App.2d at pp. 801-802.)

[20]The *Smith* court relied upon two cases for its conclusion that actual payment of the settlement by the insured would also be sufficient. (*Isaacson* v. *California Ins. Guarantee Assn.*, *supra*, 44 Cal.3d 775, 792 [insureds of insolvent insurer sought to recover from CIGA the $100,000 which they had paid toward a $500,000 settlement after CIGA had refused to contribute more than $400,000] and *Continental Casualty Co.* v. *Royal Ins. Co.* (1990) 219 Cal.App.3d 111, 117 [268 Cal.Rptr. 193] [excess insurer paid the settlement unreasonably rejected by the primary insurer and then sued the primary under the doctrine of equitable subrogation].) We find this conclusion somewhat puzzling. Nothing in either *Isaacson* or *Continental* conditioned their holdings on the fact that the insured had paid or contributed to the settlement in those particular cases. Moreover, it is not at all obvious to us why evidence made inadmissible under Evidence Code section 1155 would be any less of a problem in an action against the insurer merely because the insured had paid or contributed to the settlement; nor do we see any reason why the operation of *Isaacson's* presumptive evidence rule must necessarily depend upon such payment or contribution. No such limitation is suggested by *Isaacson*. (See, e.g., *Isaacson*, *supra*, 44 Cal.3d at pp. 793-794.)

about Evidence Code section 1155[21] and the need to have the insured's liability resolved in an adversarial context would be largely mitigated. In any case where an insured or a claimant has the benefit of *Isaacson*'s presumptive evidence rule, it will always be the insurer's option to raise an issue as to the insured's liability. Since it would be the insurer's choice to affirmatively raise such liability issue, we do not see how there could be any serious concern about prejudice to the insurer under Evidence Code section 1155. The issue will only arise where an insurer has *wrongfully* refused to defend its insured and then *only* if the insurer chooses to raise it. In those circumstances, there hardly could be any justifiable policy concerns about the insurer's disadvantage in litigation over the insured's liability. When it had a chance to litigate that issue, it wrongfully chose to abandon its insured.

With respect to *Smith*'s concern about excess insurers, we admit to some bafflement. If a primary insurer wrongfully denies coverage and an insured enters into a settlement which invades the limits of the excess policy, the excess insurer has the same right to contest the bona fides of the settlement as does the primary; and to the extent that the primary's misconduct results in an excess judgment or forces payment by the excess insurer of a reasonable settlement within the limits of the primary policy, the excess insurer has the right of equitable subrogation. (*Continental Casualty Co.* v. *Royal Ins. Co.*, *supra*, 219 Cal.App.3d at p. 117.) Further, an excess insurer will, in most cases, be unburdened by the claim that it has breached a duty to defend and thus would be free to rely on the "no action" clause.

Nonetheless, the defendant insurers argue that since *Smith* held that a stipulated judgment with a covenant not to execute was simply a device and would not be sufficient to support an assignment to a third party claimant of an insured's bad faith cause of action (*Smith* v. *State Farm Mut. Auto. Ins. Co.*, *supra*, 5 Cal.App.4th at p. 1114), the trial court properly dismissed plaintiff's complaint. *Smith*, relying on Civil Code section 2778, subdivision 5, concluded that a stipulated judgment does not represent a "recovery" imposing liability upon an indemnitor under that section so as to trigger a duty to indemnify. *Smith* says this is so because the covenant not to execute shields the insured from such liability. *Smith* equated such a stipulated judgment with the settlement and dismissal of the action which was rejected in *Doser* v. *Middlesex Mutual Ins. Co.* (1980) 101 Cal.App.3d 883, 892-894 [162 Cal.Rptr. 115].[22] The implicit foundation of this reasoning, as applied to the facts before us, is that since RHCA received a covenant not to execute

---

[21]Evidence Code section 1155 provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing."

[22]Given the facts of this case, reliance on *Doser* seems misplaced. *Doser* is not a case which turned on a wrongful denial of coverage or refusal to provide a defense which is so central to

it has suffered no detriment, no loss and no damage; therefore, a liability insurer, which has undertaken to pay those damages which RHCA has become legally obligated to pay, should have no responsibility because RHCA no longer has a legal obligation in view of the covenant. **(9)** However, this argument simply has no merit in light of the well-established rule that upon the breach by an insurer of its duty to defend, the insured may, in the absence of fraud or collusion, *and without forfeiting his or her right of indemnification,* assign that right to the third party claimant in exchange for the claimant's covenant not to execute or otherwise enforce the claim. (*Zander* v. *Texaco, Inc., supra,* 259 Cal.App.2d at pp. 802-803; see also *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 536 [15 Cal.Rptr.2d 726].) Thus, we reject *Smith*'s construction and application of Civil Code section 2778, subdivision 5, as a basis for relieving the defendant insurers of any liability to plaintiff.

From all of the foregoing, we conclude that the decision in *Smith* does not support the position taken in this matter by the defendant insurers. Merely because plaintiff's complaint is based upon a judgment which was entered pursuant to a stipulation and was accompanied by a covenant not to execute, it does not follow that the defendant insurers were entitled to the dismissal granted by the trial court.

We are concerned here with the enforceability of a stipulated judgment in a direct action against the insurer. While the fact that a covenant not to execute was given to RHCA might bear circumstantially upon the validity or bona fides of the settlement, its presence can hardly make the judgment disappear. The critical question will still remain: was the settlement reasonable and free of fraud and collusion? It is upon the resolution of that issue that plaintiff's case will depend. If it is resolved in plaintiff's favor then we see no reason why the concerns expressed in *Smith* and the policy on which Civil Code section 2778, subdivision 5, is grounded would not be satisfied.

---

the issues and resolution of this matter. In *Doser,* the insurer rejected a policy limits offer of $100,000 from the injured party claimant. Although the court's opinion is not entirely clear as to why, the insurer did not immediately provide a defense to all of the insureds. This was apparently due in part to a 16-month delay in making a demand on the insurer and in part to what the *Doser* court called "some obscure reason." There was no claim that the insurer had wrongfully refused to provide a defense. This was essentially a "bad faith failure to settle" case. More significantly, the claimant and the insured entered into a settlement for $980,000 in exchange for a release of the insured and a dismissal of the action. There was no judicial oversight of the settlement process and no judgment was ever entered. There was no evidence ever presented or considered that the $980,000 settlement figure was reasonable or in any way approximated the claimant's actual damages. In light of the claimant's original demand of $100,000, substantial doubts were raised as to the good faith of such settlement. In that context, we also note that *Smith* expressly did not reach the question of the effect to be given to a judgment found to be in good faith under section 877.6. (*Smith* v. *State Farm Mut. Auto. Ins. Co., supra,* 5 Cal.App.4th at p. 1115, fn. 4.)

(See generally, *Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1495-1497 [13 Cal.Rptr.2d 624].) The question which then arises is whether the trial court's finding of good faith under section 877.6 is sufficient in and of itself to resolve that issue as against the defendant insurers.

### b. *Good Faith Determination Under Section 877.6*

 As we have already noted, it is settled that a default judgment hearing in which the injured party was required to present some evidence, is sufficient to satisfy the "no action" clause requirement of an "actual trial" (*National Union Fire Ins. Co.* v. *Lynette C.*, supra, 27 Cal.App.4th at p. 1449) and would bind the insurer that had denied coverage or refused to provide a defense. (*Clemmer* v. *Hartford Insurance Co.*, supra, 22 Cal.3d at pp. 884-886; *Zander* v. *Texaco, Inc.*, supra, 259 Cal.App.2d at pp. 804-806.) The same result flows where the settlement resulted in an uncontested trial rather than a default hearing. (*Samson* v. *Transamerica Ins. Co.*, supra, 30 Cal.3d at pp. 228, 236-242.) However, we do not believe that the same can be said where the nature of the judicial participation is limited to the settlement process and simply consists of a good faith determination pursuant to section 877.6. That determination, however, may well have evidentiary value in the ultimate resolution of the bona fides of the settlement; and that issue must be resolved in plaintiff's favor before she can enforce against the defendant insurers the judgment which resulted from that settlement.

 Given plaintiff's allegations, we necessarily presume that her settlement with RHCA was presented to the court together with a factual showing that plaintiff had indeed sustained damages sufficient to justify a $650,000 settlement.[23] The trial judge, having just completed an extended trial on the same liability issues in which RHCA was also a defendant and in which it had been found to have significant liability, certainly could reasonably conclude that a substantial basis for liability existed. We must therefore conclude that the bona fides of the settlement, and thus its enforceability against the defendant insurers, cannot be determined against plaintiff on demurrer.

Plaintiff argues that the determination under section 877.6 which was made by the trial court was sufficient judicial oversight to make the resulting judgment binding on the defendant insurers. The defendant insurers were given notice of the settlement and of a scheduled hearing at which evidence of the bona fides of the settlement would be presented. Apparently of the

---

[23]Such a factual showing would be required in order to successfully support a good faith motion under section 877.6. (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499-500 [213 Cal.Rptr. 256, 698 P.2d 159].)

view that there was no coverage, they chose not to appear. At least one case has held that, in such circumstances, an insurer is barred from asserting bad faith and collusion in order to prevent enforcement of the judgment which results from a good faith settlement.

That was the conclusion in *Diamond Heights Homeowners Assn.* v. *National American Ins. Co.* (1991) 227 Cal.App.3d 563 [277 Cal.Rptr. 906]. In that case, an excess insurer had refused a request to assume the defense of the insured, and had exercised the opportunity to participate in the section 877.6 hearing into the good faith and reasonableness of a proposed settlement which invaded the limits of its policy. It objected to the good faith claims made by its insured, but after the trial court had made its determination it failed to seek relief by a petition for a writ of mandamus as provided in section 877.6, subdivision (e). The *Diamond Heights* court held that this failure to seek appellate review of the good faith determination barred the insurer's subsequent bad faith and collusion claims under section 877.6 as well as under principles of res judicata and collateral estoppel. (227 Cal.App.3d at p. 583.) The court held that the insurer would stand "in the position of a 'co-obligor' barred from making a claim of bad faith against the settling parties." (*Id.* at p. 582.)

This conclusion, however, was later rejected by the court in *Pacific Estates Inc.* v. *Superior Court, supra*, 13 Cal.App.4th at pages 1572-1575, which we believe is the better reasoned view. ▮ *Pacific Estates* held that an insurer of an alleged tortfeasor could not be considered a "co-obligor on a contract debt" within the meaning of section 877.6[24] nor, as a nonparty, could it challenge a good faith determination under section 877.6; therefore, an insurer should not be bound thereby. (13 Cal.App.4th at pp. 1573-1574.) "We believe the *Diamond Heights* court construes the statutory provisions too broadly. A fair reading of the statute indicates only parties to the underlying litigation may challenge a trial court's determination of the good faith of a settlement. Section 877.6 provides for review of any adverse determination by providing in subdivision (e) that 'any *party* aggrieved by the determination may petition the proper court to review the determination

[24]In 1987, the Legislature expanded the scope of section 877.6 to include good faith determinations of settlements among "co-obligors on a contract debt." The *Pacific Estates* court concluded that this statutory change could not be construed so as to make a nonparty insurer a "co-obligor." The court stated, "We believe the purpose and intent of the 1987 legislation amending section 877.6 to include 'co-obligors on a contract debt' was to provide a similar efficient mechanism to determine the good faith of any settlement of a multiparty contract action. Nothing in the statute indicates anything to the contrary. Although there are no reported decisions construing the phrase 'co-obligors on a contract debt,' the plain language of the statute dictates the interpretation of this phrase refers to parties to a contract dispute which itself is the subject of the underlying litigation." (*Pacific Estates Inc.* v. *Superior Court, supra*, 13 Cal.App.4th at p. 1571.)

by writ of mandate.' . . . [¶] . . . [¶] If a nonparty to the underlying action is unable to seek review of an adverse decision, that nonparty is denied adequate procedural protections from potentially erroneous decisions. As a result, an unreviewable decision can provide no basis for later imposing on nonparties the preclusive effects of res judicata or collateral estoppel as to issues not fully litigated in any meaningful sense. [Citation.]" (*Id.* at p. 1573, italics added by the *Pacific Estates* court.) We concur with this reasoning and reject the conclusion of the *Diamond Heights* court. A good faith determination of a settlement between an insured and a claimant is not thereby made binding upon the insurer, although such determination will have "some evidentiary value in a later action" against the insurer. (*Pacific Estates, supra*, 13 Cal.App.4th at p. 1574.)

This is consistent with our conclusion that (1) a settlement would be presumptive evidence of an insured's liability and the amount of the damages sustained by the injured party in a later action against an insurer which wrongfully withheld coverage or a defense, and (2) a good faith determination pursuant to section 877.6, would provide evidentiary support for that presumption; and such presumption, unless overcome by evidence produced by the insurer, would make the stipulated judgment binding and the "no action" clause inapplicable. However, plaintiff asks us to give a much broader effect to a good faith determination. She primarily relies on two recent cases.

In *Sanchez* v. *Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778 [26 Cal.Rptr.2d 812], the plaintiff negotiated for a stipulated judgment against her former employer as part of the settlement of a sexual harassment action which she had filed. This settlement, which was concluded just prior to the commencement of trial, was presented to the court for its approval. Although there was no formal motion or order made pursuant to section 877.6, the court, upon hearing the terms of the proposed settlement, specifically found " 'that [it] meets the criteria stated in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates*' and accordingly is 'made in good faith.' " (21 Cal.App.4th at p. 1782.) The stipulated judgment provided that plaintiff would recover $250,000 from her corporate employer and its principal shareholder; it also included a covenant not to execute against the shareholder and a covenant not to pursue execution against the corporation for more than $25,000 and then only if plaintiff was, after a reasonable time, unable to collect from her employer's insurer, Truck Insurance Exchange.

The *Sanchez* court seemed to have no trouble concluding that the trial court's informal finding of good faith was sufficient to allay the fears of fraud or collusion which were at the heart of the *Smith* and *Wright* decisions; therefore, the court held it was error to sustain the demurrer to plaintiff's

complaint without leave to amend. It stated, in concluding the settlement was in good faith, that the trial court necessarily had to consider, inter alia, "whether there is any evidence of collusion, fraud, or tortious conduct between the plaintiff [Sanchez] and settling [employer]. [Citation.]" (*Sanchez* v. *Truck Ins. Exchange, supra,* 21 Cal.App.4th at p. 1786.) Thus, the insurer, which had eschewed multiple opportunities to defend the employer, could not hide behind the "no action" clause by asserting that the judgment, in order to be enforceable in a direct action, had to be based on an "actual trial." However, the court was silent on the question of whether the stipulated judgment was actually binding on the insurer or whether, upon remand, the insurer would be able to litigate the bona fides of the settlement. As we construe *Sanchez,* it simply holds that a stipulated judgment, based on a good faith settlement and *free of fraud or collusion,* cannot be defeated by a liability policy's "no action" clause. We agree with that holding, but it tells us nothing about the insurer's right to litigate the question of whether the settlement was actually free of fraud or collusion.

In *Roman* v. *Unigard Ins. Group* (1994) 26 Cal.App.4th 177 [31 Cal.Rptr.2d 501], the court reached a similar result. There, the settlement, which provided for a stipulated judgment and included a covenant not to execute, was examined in detail by the trial judge and was found to be fair and reasonable in a noticed section 877.6 hearing. In such circumstances, the *Roman* court said, ". . . there is no basis for concern . . . that the parties engaged in collusive or abusive conduct." (26 Cal.App.4th at p. 184.) This was sufficient to satisfy the requirement that there be "a judgment or settlement of a claim" against the insured in order to recognize the insured's assignment of a bad faith cause of action against the insurer. (*Ibid.*) The *Roman* court, without much analysis and relying entirely on *Sanchez,* reversed a summary judgment in favor of the insurer. Unfortunately, the court gave no consideration to the procedural due process concerns raised in *Pacific Estates, Inc.* v. *Superior Court, supra,* 13 Cal.App.4th at pages 1571-1575.

In view of such procedural due process issues, we simply cannot read either *Sanchez* or *Roman* to mean that an insurer is bound by the good faith determination and cannot litigate the bona fides of the settlement in either the direct action brought to enforce the stipulated judgment or in the bad faith action, the assignment of which is based on such judgment. To the extent that either case could be construed as binding a nonparty insurer to the good faith determination with no procedural opportunity whatever to contest the issues of fraud or collusion, we decline to follow them. (13b) A nonparty insurer must be given a fair opportunity to litigate the question of whether the settlement was unreasonable or was the product of fraud or collusion between a settling insured and the claimant. To hold

otherwise would in effect treat a determination of good faith under section 877.6 as the procedural equivalent of a judgment entered after a default hearing or uncontested trial. This we cannot do. As we have already stated, those latter proceedings provide an opportunity for independent judicial review and adjudication of the evidence relating to the fact and amount of the insured's liability. The risk of fraud or collusion is sufficiently reduced by such judicial adjudicative participation that the breaching insurer is properly bound by the resulting judgment.

That is not the case with respect to a motion under section 877.6. The court, in ruling on such a motion, does not adjudicate the issues of liability or damages, but rather determines whether the settlement reflects a reasonable approximation of the fact and amount of the insured's exposure. The court may disregard the possible impact of fraud or collusion on the parties' insurers. (*Pacific Estates* v. *Superior Court, supra,* 13 Cal.App.4th at p. 1576.) Contrary to the broader implication which might be found in the language of *Sanchez* v. *Truck Ins. Exchange, supra,* 21 Cal.App.4th at page 1786, the court considers only "the existence of collusion, fraud, or tortious conduct aimed to injure the interests of *nonsettling defendants.*" (*Tech-Bilt Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 499, italics added.) Finally, it does all of this in a procedural context in which the insurer has no right to participate. An insurer is not a party entitled to oppose a good faith motion (*Pacific Estates, supra,* 13 Cal.App.4th at pp. 1573-1574) and for it to do so might, in addition, unfairly and unreasonably interfere with a settlement which could well be in the best interests of its insured, *particularly* if a covenant not to execute is a part of that settlement.

This leaves us with the question of just how we strike a proper balance between the competing interests of the insurer and the abandoned insured when there is a dispute as to the bona fides of a settlement made by the insured. How do we bring final resolution to the critical issues of whether the settlement was reasonable and free from fraud and collusion?

### 5. A Settlement by the Abandoned Insured Gives Rise to an Evidentiary Presumption and Justifies a Shifting of the Burden of Proof

As already discussed, an insured who has been abandoned by his or her insurer and elects to settle rather than risk an adverse judgment is entitled to an evidentiary presumption, in a subsequent action against the insurer to enforce policy provisions, as to the "insured's liability on the underlying claim, and the amount of such liability." (*Isaacson* v. *California Ins. Guarantee Assn., supra,* 44 Cal.3d at pp. 791-792.) The scope of this presumption was described in an earlier case relied upon by *Isaacson:* "[W]here there is no trial and no judgment establishing the liability of the

insured, but a settlement of the litigation has been made, the question whether the liability of the insured was one which the contract of insurance covered is still open, as is also the question as to the fact of liability and the extent thereof, and these questions may be litigated and determined in the action brought by the insured to recover the amount so paid in settlement. The settlement, or a judgment rendered upon a stipulation of such a settlement, becomes presumptive evidence only of the liability of the insured and the amount thereof, which presumption is subject to being overcome by proof on the part of the insurer. [Citations.]" (*Lamb* v. *Belt Casualty Co.*, *supra*, 3 Cal.App.2d at pp. 631-632.)

Obviously, to demonstrate the right to rely on such presumption, an insured should be required to establish certain basic or foundational facts. We believe they are three in number: (1) the insurer wrongfully failed or refused to provide coverage or a defense, (2) the insured thereafter entered into a settlement of the litigation which was (3) reasonable in the sense that it reflected an informed and good faith effort by the insured to resolve the claim. (*Isaacson* v. *California Ins. Guarantee Assn.*, *supra*, 44 Cal.3d at pp. 791, 793-794; *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.*, *supra*, 12 Cal.App.4th at p. 545.[25]) The nature of the evidence which would demonstrate the first two basic facts requires no discussion; however, some comment as to the third is appropriate.

The insured can satisfy its prima facie burden of showing that the settlement was reasonable by presenting the same kind of evidence which would support a determination of good faith under section 877.6. "Good faith," for purposes of section 877.6, requires "the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries. . . . [¶] . . . [T]he intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a

---

[25]The *Xebec* court also discussed an additional foundational fact which it characterized as the "validity" of the settlement as to the insurer. However, it is clear from the court's opinion that what it meant was the settlement should be free from collusion. The *Xebec* opinion is very confusing on this issue since it concluded that the trial court was correct in instructing the jury that the insurer's claim that the insured's settlement was collusive was in the nature of an affirmative defense which the insurer had the burden of proving. (12 Cal.App.4th at pp. 551-553.) As we hold here, this is the correct result. To the extent that some portion of the *Xebec* opinion might suggest that the insured has a burden (beyond making a prima facie showing that the settlement was reasonable) to prove the absence of fraud or collusion, it is inconsistent with the court's holding and subsequent discussion of the issue and, for the reasons set forth in this opinion, we decline to follow it.

settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 499.) If there has already been a determination of good faith made under section 877.6, then that fact would itself be substantial evidence of reasonableness and would be sufficient to satisfy the insured's prima facie burden.

Once evidence of these basic facts has been presented by the insured then the question is what is the effect of the presumption which arises. Is it one which only affects "the burden of producing evidence" (Evid. Code, § 603) or is it one which affects "the burden of proof" (Evid. Code, § 605)?[26] The court in *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co., supra,* 12 Cal.App.4th at pages 548-549, addressed this issue and concluded that the evidentiary presumption given to the insured under *Isaacson* is one which affects the burden of proof. In reaching that conclusion, the court relied upon the statutory definition that a presumption affecting the burden of proof is one which is established in order "to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied." (Evid. Code, § 605.)

"As commentators have recognized, presumptions backed by policy concerns are justifiably given greater weight under our state's scheme. 'Certainly if a presumption is not based on probability, but is based solely on social policy, there may be more, and not less, reason to preserve it in the face of contrary proof. A presumption based on social policy may need an extra boost to ensure that the policy is not overlooked in the face of some explanation given by the opponent.' (Broun, *The Unfulfillable Promise of One Rule For All Presumptions* (1984) 62 N.C. L.Rev, 697, 703.) [¶] Despite the laudable efforts of the Legislature to assist in classifying the burdens, determining which burden is involved is, to say the least, often confusing. As the Law Revision Commission noted in commenting on section 605, the burden of proof, like the burden of production, is frequently 'designed to

---

[26]Evidence Code section 603 provides: "A presumption affecting the burden of producing evidence is a presumption established to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied."

Evidence Code section 605 provides: "A presumption affecting the burden of proof is a presumption established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of marriage, the stability of titles to property, or the security of those who entrust themselves or their property to the administration of others."

facilitate determination of the action in which [it is] applied. Superficially, therefore, such presumptions may appear merely to be presumptions affecting the burden of producing evidence. What makes a presumption one affecting the burden of proof is the fact that there is always some further reason of policy for the establishment of the presumption' (See Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 605, p. 250.)" (*Rancho Santa Fe Pharmacy, Inc.* v. *Seyfert* (1990) 219 Cal.App.3d 875, 882-883 [268 Cal.Rptr. 505].) Such a "further reason of policy" is clearly present here.

The *Xebec* court emphasized that the presumption only arises in those cases where the insurer has breached the underlying insurance contract. "Where such a breach has occurred, there is an obvious need, as a matter of policy, to permit the insured to protect his or her position by settling the third party's claim, so long as the settlement is in fact reasonable. The unacceptable alternative would be to compel the insured, following the insurer's breach, invariably to force the dispute to trial and thus to risk additional (and perhaps uninsured) exposure and to incur unnecessary expenditure of the insured's own money and of the state's overtaxed judicial resources. It is sound and rational to conclude that the burden of showing that the settlement does *not* reflect the fact and amount of the insured's liability should fall upon the insurer whose breach has occasioned the settlement." (*Xebec Development Partners, Ltd.* v. *National Union Fire Ins.*, *supra*, 12 Cal.App.4th at p. 549.)

We agree with the *Xebec* court's analysis and believe the same conclusion must flow here. In no other way can the courts give any meaningful protection to an insured who is abandoned by a liability insurer wrongfully denying coverage or refusing a defense and at the same time provide to the insurer some measure of procedural due process in order to protect against the consequences of a fraudulent or collusive settlement. (See *Pacific Estates, Inc.* v. *Superior Court*, *supra*, 13 Cal.App.4th at pp. 1574-1575.)

Thus, if plaintiff produces evidence of the basic or foundational facts, then the burden of proof will shift to the defendant insurers to persuade the trier of fact, by a preponderance of the evidence, that RHCA's settlement did not represent a reasonable resolution of plaintiff's claim or that the settlement was the product of fraud or collusion. The principles of fraud and collusion are self-evident and require no extended discussion. The facts and circumstances which will lead a court to conclude that either are present are limited only by the imagination of those who would cheat and deceive.[27]

---

[27]One court suggested an example when it stated that a "cognizable claim of fraud or collusion would [require a showing that the third party claimant] had no substantial claim or

## Conclusion

The trial court erred in sustaining the demurrers (or granting judgment on the pleadings) without leave to amend. Plaintiff's complaint sufficiently alleged (or it is claimed that plaintiff can allege) that (1) RHCA had been wrongfully abandoned by at least some of its liability insurers, and (2) a reasonable settlement had been made. Such allegations, if supported by evidence at trial, would be sufficient to raise a presumption that the settlement reflected the existence and amount of RHCA's liability to plaintiff. The defendant insurers would at trial then have to bear the burden of proving that the settlement and the resulting stipulated judgment did not represent a reasonable resolution of plaintiff's claim against RHCA or were the product of fraud or collusion. Unless the defendant insurers are able to meet that proof burden, the stipulated judgment will be binding upon them and they can not avoid liability by reliance on the "no action" clause to bar plaintiff's suit.[28]

## Disposition

The judgment is reversed and the matter is remanded for further proceedings not inconsistent with the views expressed herein. Plaintiff shall recover her costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied July 27, 1995.

---

chance of recovery and that the [insured] had permitted a judgment in [the claimant's] favor which was disproportionate to his injuries; [and that the insurer] had no notice of this in time to intervene . . . ." (*Zander v. Texaco, Inc., supra,* 259 Cal.App.2d at p. 806.)

[28]This, of course, may have application only to RHCA's primary insurers. An excess insurer has no right or duty to participate in the defense, absent policy language to the contrary, until the primary policy limits are exhausted. (*Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 370-371 [165 Cal.Rptr. 799, 612 P.2d 889]; *Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 23 Cal.App.4th 1774, 1779-1782 [29 Cal.Rptr.2d 32]; *Continental Casualty Co.* v. *Royal Ins. Co., supra,* 219 Cal.App.3d at p. 119.) If the amount of the stipulated judgment does not invade the limits of an excess policy, and there is no basis for requiring the excess carrier to otherwise "drop down" and provide coverage for said judgment, then plaintiff can assert no claim against such insurer.