[No. C038907. Third Dist. July 22, 2003.]

MARIE Y. et al., Plaintiffs and Appellants, v.
GENERAL STAR INDEMNITY COMPANY, Defendant and Appellant.

COUNSEL

Farmer, Murphy, Smith, & Alliston, George E. Murphy and Alan W. Foutz for Plaintiffs and Appellants.

Barbanel & Treuer, Alan H. Barbanel and Stephen D. Treuer for Defendant and Appellant.

OPINION

**SIMS, Acting P.J.**—The appeal and cross-appeal in this case arise out of a judgment in the amount of $1,415,639.54 (plus costs) in favor of Marie Y.[1] against General Star Indemnity Company (General Star) for breach of an insurance contract (but *not* bad faith). The insurance policy at issue is a "Dentist's Professional Liability" policy issued to David R. Phipps, D.D.S. Liability of General Star is predicated on the company's refusal to defend or indemnify Phipps in an action for damages brought by Marie Y. against Phipps for the sexual misconduct of Phipps, and related claims. Phipps assigned his rights against General Star to Marie Y., who then brought the instant action, which resulted in the million-dollar judgment from which General Star appeals.

We shall conclude that General Star breached its duty to defend Phipps but that General Star never had a duty to indemnify Phipps, and, indeed indemnification is barred by Insurance Code section 533 (section 533).[2] Consequently, we shall reverse the judgment and remand to the trial court to award Marie Y. damages only for the amount of reasonable attorneys' fees and costs incurred by Phipps in defending Marie Y.' s action.

Marie Y. has cross-appealed from the trial court's order taxing costs. Since our reversal of the judgment includes reversal of the trial court's cost award, Marie Y.'s cross-appeal is moot; the question of costs must be determined anew on remand.

---

[1] Gary Y., Marie's then husband, was a plaintiff in the underlying action and also is a plaintiff in the present action. As his claim in both actions is derivative, we shall use "Marie Y." to refer either to plaintiffs collectively or to Marie Y.

[2] Section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## The underlying action

*Background*

On April 5, 1994, David Phipps was practicing in a partnership called Family Dentists of Roseville with fellow dentists Mark Phipps (David's brother) and Robert Shorey. (References to "Phipps" hereafter are to David Phipps.) Kimberly Altenburg Fisch and Robin Stevens worked for the partnership as chairside dental assistants.

In the 1980's, Phipps incurred criminal and professional penalties for molesting female patients during dental procedures. By April 1994, however, he was no longer under any restrictions in his practice.

A criminal complaint was filed against Phipps in 1987, alleging acts of sexual battery against six patients during the period 1984–1985 (Pen. Code, § 243.4, subds. (a), (b)).[4] He eventually entered a plea of nolo contendere to two counts of misdemeanor sexual battery involving patients V.P. and L.N. (Pen. Code, § 243.4, former subd. (d)(1), now subd. (e)(1).)[5]

Also in 1987, the Dental Board of California (Dental Board) undertook disciplinary proceedings against Phipps. After he stipulated to negligence as to V.P. and L.N., the Dental Board suspended his license for seven months and put him on five years' probation; during the first year of his probation he could not treat female patients, and during the last four years could do so only with a chairside assistant present.

---

[3] The facts given here were undisputed as of the trial court's ruling on General Star's summary judgment motion (or *disputed* only by evidentiary objections the court overruled).

[4] Penal Code section 243.4, subdivision (a), provides in part: "Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery."

Subdivision (b) provides in part: "Any person who touches an intimate part of another person who is institutionalized for medical treatment and who is seriously disabled or medically incapacitated, if the touching is against the will of the person touched, and if the touching is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery." Both offenses are "wobblers."

[5] Penal Code section 243.4, former subdivision (d)(1) (redesignated subd. (e)(1) by Stats. 2002, ch. 302, § 1) provided in part: "Any person who touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse is guilty of misdemeanor sexual battery."

*Phipps's insurance policy*

General Star issued Phipps a Dentists' Professional Liability Policy for the period July 1, 1993, to July 1, 1994, carrying a coverage limit of $200,000 for each "dental incident." The policy's insuring agreement provides in part: "We will pay all sums which the insured shall become legally obligated to pay as damages because of any claim that is first made against the insured arising out of a dental incident taking place on or after the retroactive date ... and before the expiration of the policy period in the practice of the profession of dentistry by the insured or by any person for whose acts or omissions the insured is legally responsible." (Bolding omitted.)

The policy defines "dental incident" in part as "any act, error, omission, or mistake in the rendering of or failure to render services in the profession of dentistry by an insured or any person for whose acts or omissions an insured is legally responsible." The policy defines the "Profession of Dentistry" in part as "services performed in the practice of the profession of dentistry as defined in the business and the professional codes of the state where you practice." (Bolding omitted.)

General Star's policy defines the insurer's duty to defend Phipps at two points.

First, the policy specifies a general duty to defend as follows: "If a claim is made or suit is brought against any insured for damages because of a dental incident, to which this policy applies, even if allegations in such claim or suit are groundless, false or fraudulent, we will:

"(1) provide a defense at our expense by counsel of our choice."

Second, the policy speaks to the duty to defend in the following exclusion (exclusion (h)):

"This insurance does not apply: [¶] ... [¶]

"h. to liability for any damages arising out of a dental incident which is also a willful violation of a statu[t]e, ordinance or regulation imposing criminal penalties; however[,]

"(1) we will defend any civil suit against the insured seeking amounts which would be covered if this exclusion did not apply and

"(2) in such case we will pay only fees, costs, and expenses of such defense; any payment made under this provision will reduce the limits of insurance by the amount of such payment." (Capitalization and bolding omitted.)

*The events of April 5, 1994*

Marie Y. testified under oath in the underlying action, and in related criminal and disciplinary proceedings against Phipps, as follows:

She went to Phipps's office for dental treatment on April 5, 1994. He administered nitrous oxide to her. It made her extremely relaxed, with her muscles and eyelids heavy; during the two-hour session, her eyes were closed and she did not speak.

During the procedure, Marie Y. felt Phipps's hand go underneath the dental bib to give her breast a sudden squeeze or caress, putting his hand completely over it; he squeezed her right breast three times and her left breast once. She did not consent to these touchings and considered them inappropriate. Phipps then put his hand under Marie Y.'s shorts and slid it four inches up her right thigh to the panty line. He also put his hand on top of hers as it rested above her pubic area.

According to the testimony of Kimberly Altenburg Fisch, Phipps's chairside assistant, in deposition in the underlying action and in the disciplinary proceeding against Phipps, he asked her to leave the room and bring a tray of instruments to the sterilization room. She turned and saw him with his hand under Marie Y.'s dental bib, making circular motions. When Fisch walked back into the room, he jerked his hand away.

Later in the procedure, Phipps asked Fisch to take Marie Y.'s chart to the reception area. As Fisch went that way, she asked Robin Stevens, another chairside assistant, to keep an eye on Phipps. According to Stevens's testimony in deposition and in the disciplinary proceeding, she saw Phipps slip his hand under Marie Y.'s dental bib, then move his hand in a circle for about 15 seconds; she did not intervene.

*The original complaint*

On August 30, 1994, Marie Y. filed a complaint for damages against Phipps, Mark Phipps, and Robert Shorey "as individuals and dba Family Dentists of Roseville, a partnership," and 30 Doe defendants.[6] The complaint stated counts (labeled "cause[s] of action") of negligence, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.

Marie Y. alleged Phipps's conduct in touching Marie Y.'s breasts and pubic area was "improper, unprofessional and totally void of a legitimate diagnostic

---

[6] The parties disputed whether this caption named the partnership itself as a defendant. We need not resolve this dispute.

motive"; as to the battery count, Phipps "acted with the intent to cause a harmful and offensive contact with plaintiff's breasts and pubic area in that he put his hands on her breasts several times and rubbed her pubic area with his hand, and sexually offensive contacts with plaintiff directly resulted." Marie Y. alleged defendants Mark Phipps and Robert Shorey, who knew of Phipps's past misconduct with female patients, were negligent in evaluating, supervising, and controlling Phipps. In addition, Marie Y. alleged Does 11 through 20 were "dental assistants, nurses, and/or technicians" employed by the named defendants, but did not state any factual basis for their liability.

*General Star's initial response*

Phipps's counsel at the time, Robert Zaro, tendered the complaint to General Star, requesting a defense and indemnity. In November 1994, General Star replied that it would not indemnify Phipps, but would defend him under a reservation of rights, specifically including "the right to withdraw coverage in its entirety pending the results of discovery and the pending criminal proceeding." Its letter states in part: "Our investigation indicates that the claim of Marie [Y.] involves improper and unacceptable, non-consensual [*sic*] physical contact of a sexual nature by Mr. Phipps during a dental exam conducted in his office. We have also determined that your client admitted to the Board of Dental Examiners that this did, in fact, occur."[7]

On April 4, 1995, Marie Y. made a settlement offer to General Star under Code of Civil Procedure section 998 (section 998) for an amount within the policy limits. General Star declined the offer.

*The criminal proceedings*

In December 1994 a criminal complaint was filed against Phipps in Placer County Superior Court alleging attempted sexual battery by restraint, a felony (Penal Code, §§ 664/243.4, subd. (a)), and misdemeanor sexual battery (§ 243.4, subd. (d); see fn. 5, p. 934, *ante*) as to Marie Y. The complaint also alleged misdemeanor sexual battery as to patient B.C.

The case went to trial in 1995. Marie Y. testified there as indicated above.

On November 14, 1995, Phipps entered a plea of nolo contendere to two counts of misdemeanor sexual battery. He served 365 days in Placer County Jail as a result of his plea.

---

[7] The last sentence apparently refers to purported statements by Dental Board investigators after a May 1994 interview with Phipps.

*The Dental Board proceedings*

After the chairside assistants told Robert Shorey what they had seen, Shorey reported Phipps's conduct to the Dental Board on April 9, 1994. In June 1994, the Dental Board began new disciplinary proceedings against Phipps.

Administrative Law Judge (ALJ) Keith Levy heard the matter in a contested proceeding beginning in December 1995. Phipps and the Dental Board were represented by counsel; witnesses testified under oath.

Marie Y., Fisch, and Stevens testified as indicated above. A psychologist retained by Phipps's counsel testified that Phipps admitted he "felt" Marie Y.'s breast and experienced "some arousal"; although he knew he should not have done it, he saw himself as a "pleaser" who "wanted to please [Marie Y.] in a bizarre way," and it made him "feel good" that he could make patients "feel good sexually." Dental Board investigators Lynn Thornton and Gayle Betzing testified that during an interview in May 1994, Phipps admitted touching Marie Y.'s breast with the intent to please her and without any therapeutic purpose; he felt "guilty" and remorseful afterward. Phipps also admitted to the investigators that he had inappropriately touched other patients between June 1993, when his probation ended, and April 1994.

ALJ Levy issued a proposed decision on May 17, 1996, which included an order revoking Phipps's license. On June 6, 1996, the Dental Board adopted the proposed decision, effective July 6, 1996. The decision included the following material findings of fact and law:

"On April 5, 1994, female patient M.Y. went to respondent's office for a dental appointment. It was her fourth visit to respondent's office and since she had always been very nervous previously, respondent decided to administer nitrous oxide to M.Y. This caused M.Y.'s muscles to feel heavy and she was relaxed. She was conscious and aware of what was going on in the treatment room and what respondent was doing to her. While under the influence of nitrous oxide and when the dental assistant was requested by respondent to take some instruments to the sterilization room, respondent placed his hand under M.Y.'s bib and squeezed her right breast three times and her left breast once. Respondent also attempted to put his hand up the patient's shorts and touched M.Y.'s pubic area over her clothes."

The Board found that Phipps committed "acts of sexual abuse, and sexual misconduct" toward Marie Y. on April 5, 1994, while she was under the influence of nitrous oxide but "conscious and aware of what was going on in the treatment room and what [Phipps] was doing to her." These acts were also

crimes of which he had been "convicted on a plea of nolo contendere," and which "are substantially related to the qualifications, functions or duties of a dentist, as defined in Title 16, California Code of Regulations section 1019, by evidencing present or potential unfitness of a dentist to perform the functions authorized by his certificate in a manner consistent with the public health, safety or welfare." Furthermore, Phipps had admitted to Dental Board investigators that he touched other patients inappropriately between the end of his probation and the Marie Y. incident. Although he had been undergoing treatment for a psychiatric disorder, there was no evidence that the treatment would guarantee his good behavior in the future. The seriousness of his misconduct and his record of discipline, combined with the lack of a consistent successful treatment record and the substantial potential risk to the public, required his license to be revoked. (Bus. & Prof. Code, §§ 726, 1670.1, 1680, subd. (e).)[8]

### General Star's withdrawal of defense to Marie Y.'s suit

On March 19, 1996 (after Phipps's nolo plea, but before the Dental Board's decision), General Star withdrew its defense. General Star's letter to attorney Zaro reads in part: "In its reservation of rights letter, General Star stated that coverage would be withdrawn if Dr. Phipps was guilty of a criminal act, including sexual contact or other activities which do not qualify as a dental incident associated with the profession of dentistry. General Star has discovered that Dr. Phipps has pled 'Nolo Contendere' to a sexual battery charge. This plea has the similar legal effect as pleading guilty. Sexual battery does not meet the definition of dental incident nor the definition of profession of dentistry. Likewise, the claims made by [Marie Y.] in her civil action do not meet the definition of dental incident nor the definition of profession of dentistry.

---

[8] Business and Professions Code section 726 provides in part: "The commission of any act of sexual abuse, misconduct, or relations with a patient, client, or customer constitutes unprofessional conduct and grounds for disciplinary action for any person licensed under this division."

Business and Professions Code section 1670.1 provides in part: "Any licentiate under this chapter may have his or her license revoked or suspended or be reprimanded or be placed on probation by the board for conviction of a crime substantially related to the qualifications, functions, or duties of a dentist or dental auxiliary, in which case the record of conviction or a certified copy thereof ... shall be conclusive evidence.

"The board shall undertake proceedings under this section upon the receipt of a certified copy of the record of conviction. A plea or verdict of guilty *or a conviction following a plea of nolo contendere substantially related to the qualifications, functions, or duties of a dentist or dental auxiliary is deemed to be a conviction within the meaning of this section.*" (Italics added.)

Business and Professions Code section 1680, subdivision (e), defines "unprofessional conduct by a person licensed under this chapter" to include "[t]he committing of any act or acts of gross immorality substantially related to the practice of dentistry."

"Based upon the above, it is clear the criminal acts of Dr. [Phipps] are not covered by the General Star Policy." (Bolding omitted.)

Attorney Zaro wrote to General Star in April 1996, seeking reinstatement of its defense. Zaro asserted: (1) Phipps's nolo plea did not bar coverage, and (2) Marie Y.'s complaint alleged negligence, which triggered coverage.

On April 25, 1996, Blaise Curet, General Star's outside coverage counsel, replied that both the insuring agreement (defining "Dental Incident" and "Profession of Dentistry") and the policy's exclusion (h) (excluding liability for damages arising out of a dental incident which is also a willful violation of a statute imposing criminal penalties) barred coverage. Curet rejected coverage for negligence on the ground that only Gary Y., who was not Phipps's patient, had alleged negligence.

*The first amended complaint*

On or about June 13, 1996 (after the Dental Board had adopted the ALJ's proposed decision in the disciplinary proceeding against Phipps), Marie Y. filed a first amended complaint. It stated "[c]ause[s] of [a]ction" for negligence, breach of fiduciary duty, breach of nondelegable duty, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, fraud and deceit, and "[j]oint [e]conomic [e]nterprise."

As to negligence, the amended complaint made some new allegations. It alleged Phipps's partners' failure to protect his patients, given the partners' knowledge of his past misconduct, made "defendants, and each of them, … vicariously liable under the unique facts of this case." It alleged Phipps's administering nitrous oxide to Marie Y. was done "in part for therapeutic motive" and his touchings of Marie Y. were "*partially* without legitimate therapeutic motive." (Italics added.) It also alleged: "A chairside assistant, KIMBERLY ALTENBERG [*sic*], who was an agent and employee of FDR [Family Dentists of Roseville], observed … PHIPPS … sexually touching MARIE Y. during the course of dental treatment, and did nothing to stop him; nor did she immediately report the incident or seek aid from Defendant SHOREY, who was present in another operatory of the same office, in order to safeguard the plaintiff." (However, it did not name her as a defendant. Nor did the later second amended complaint.) Finally, it alleged defendants Mark Phipps and Robert Shorey were negligent inter alia for "failure to properly instruct and train FDR staff in procedures should they observe … PHIPPS … sexual [*sic*] molesting a patient."

On June 26, 1996, Zaro tendered the first amended complaint to General Star, asserting that unspecified new allegations therein created coverage. On

July 16, 1996, Curet replied that General Star's position was unchanged because the first amended complaint was based on Phipps's sexual misconduct and contained no claims independent of that conduct.

*The second amended complaint*

On October 18, 1996, Marie Y. filed a second amended complaint, unchanged from the first amended complaint in any way material to this case. On November 21, 1996, Zaro tendered the second amended complaint to General Star, again demanding a defense.

On November 27, 1996, Marie Y. offered to settle the claim against Phipps alone within the policy limits. General Star declined the offer.

On December 31, 1996, Phipps's new counsel, Craig Farmer, wrote General Star to make a "final demand" for a defense. Though Farmer argued extensively against General Star's position, he did not suggest that coverage might exist based on Phipps's vicarious liability for the chairside assistants' negligence.

On January 13, 1997, Curet replied to Zaro and Farmer that General Star's position was unchanged. In addition to restating his previous points, Curet cited Phipps's admission to the Dental Board investigators that he intentionally molested Marie Y. (As noted, the Dental Board's decision relied on Phipps's admissions to the investigators as one of the grounds for revoking Phipps's license.)

*The trial of Marie Y.'s action*

On September 8, 1997, the scheduled first day of trial, Marie Y. submitted a trial brief arguing all causes of action pleaded in the second amended complaint as against all defendants. As to Phipps's negligence, Marie Y. argued he touched her inappropriately without a legitimate medical purpose, administered nitrous oxide in part for purposes unrelated to legitimate medical treatment, treated a female patient under nitrous oxide without a chairside assistant present, failed to give Marie Y. prior notice of his history of sexual misconduct with female patients, and failed to disclose that history to his dental plan. She did not argue Phipps was vicariously liable on any ground.

Also on September 8, 1997, defendants Mark Phipps and Robert Shorey settled with Marie Y. The trial court approved the settlement.

On September 10, 1997, Marie Y. offered to settle the claim against Phipps within the policy limits. General Star declined the offer.

On September 16, 1997, the case came on for bench trial against Phipps alone. Marie Y. dismissed all intentional tort allegations and proceeded only on negligence. Marie Y. also submitted a "[s]upplemental [t]rial [b]rief" which stated the new claim that Phipps was vicariously liable for the chairside assistants' negligent failure to protect Marie Y. against him. The brief asserted: "Regardless of who employs or pays the dental assistant or chairside[] who takes part in the performance of dental services incidental to the dental treatment being rendered, if while engaged in such service[] the dental assistant is under the direction of a certain dentist[] so as to be the dentist's temporary servant or agent, *then any negligence on the part of any such dental assistant is in fact the negligence of the dentist*." (Italics added.)[9]

At trial, Phipps's counsel conceded that inappropriate touchings may have occurred, that if they did Phipps's conduct fell below the standard of care, and that Marie Y. had suffered trauma. He "question[ed]" only whether Phipps's conduct was intentional—a point no longer at issue.

Marie Y. testified, as before, that Phipps touched her repeatedly on the breasts and pubic area during her treatment on April 5, 1994. She also testified extensively about the immediate and long-term emotional trauma the incident caused her.

Phipps testified that he administered nitrous oxide because Marie Y. was a very nervous patient. Some patients under nitrous oxide are prone to distortion and fantasizing. He became concerned when Marie Y. did not respond to questions. When other patients under nitrous oxide were unresponsive, he would pat them on the hand or shoulder, jostle them in the shoulder, or put a knuckle into their ribs. He touched Marie Y. similarly. He admitted, however, that some of his touchings may have been inappropriate and without a dental purpose.

Marie Y.'s counsel asked Phipps whether his assistants' "inadvertence" would also be his "inadvertence"; he said, "That's my understanding." Phipps's counsel did not object to this question and answer.

The parties stipulated to admit the depositions of Kimberly Altenburg Fisch and Robin Stevens. They also stipulated to admit the depositions of expert witnesses who opined that Fisch's and Stevens's conduct fell below the standard of care for dental assistants.

---

[9] This theory of liability is sometimes called the "captain of the ship" doctrine. Under that doctrine, a surgeon is responsible for the acts and omissions of assistants acting under the surgeon's direction in the operating room. (6 Witkin, Summary of Cal. Law (2003 supp.) Torts, § 795, p. 74; see *Ybarra v. Spangard* (1944) 25 Cal.2d 486, 492 [154 P.2d 687]; *Ales v. Ryan* (1936) 8 Cal.2d 82, 104 [64 P.2d 409]; Com. to BAJI No. 6.06 (9th ed. 2002) p. 135.)

Phipps's insurance policy was not presented in evidence. No witness testified as to General Star's conduct toward Phipps.

The trial court (Judge Michael G. Virga presiding) found that Phipps negligently touched Marie Y. and negligently failed to ensure that the effects of nitrous oxide did not cause her to misperceive his touchings. Under the "captain of the ship" doctrine, the court also imputed to Phipps the negligent failure of his chairside assistants to intercede to protect Marie Y. The court entered judgment against Phipps in the amount of $1,032,276 plus interest and costs.

In August or September 1998, Phipps assigned his rights against General Star to Marie Y. in exchange for her covenant not to execute on the judgment against him.

THE PRESENT ACTION

### The complaint

In her first amended complaint, Marie Y. as Phipps's assignee alleged that General Star breached its contract with Phipps and the implied covenant of good faith and fair dealing by withdrawing its defense to the underlying action "on or about March 19, 1996" (i.e., before Marie Y. filed her first amended complaint in that action) and by refusing to reinstate its defense thereafter. General Star answered, raising affirmative defenses which included lack of coverage under the express terms of Phipps's policy and section 533.

### General Star's motion for summary judgment

In its motion for summary judgment or summary adjudication, General Star asserted in part:

1. Molesting a patient is not "the rendering of services in the profession of dentistry" (capitalization omitted) within the meaning of Phipps's policy. As Phipps's assignee, Marie Y. was collaterally estopped by the Dental Board's finding that Phipps molested her; even if collateral estoppel did not apply, ample evidence showed Phipps intentionally molested Marie Y.; and Phipps's alleged negligent supervision of his assistants did not provide a ground for coverage because it was an integral part of the molestation.

2. Section 533 precludes coverage under Phipps's policy because his conduct was willful.

3. Even assuming Phipps's acts constitute a "dental incident" under the policy, the policy expressly excludes a duty to indemnify for damages *arising out of* a dental incident that is also a willful violation of statute imposing criminal penalties.

4. Coverage cannot be based solely on the alleged negligence of the dental assistants or the partnership because they were not parties to the underlying action.

5. The underlying action did not decide any coverage issues.

*Marie Y.'s opposition*

Marie Y. argued:

1. When General Star withdrew its defense and refused reasonable settlement offers, it forfeited its right to challenge coverage and is bound by the judgment. Because the trial court did not break down the verdict as between Phipps and the chairside assistants, General Star is liable for the entire judgment. Its refusal to settle exposed it to a judgment in excess of policy limits which was not the result of fraud or collusion.

2. Collateral estoppel does not apply to the Dental Board's findings and Marie Y. is not bound by them.

3. Phipps' s alleged conduct with other patients cannot be considered as evidence he intentionally molested Marie Y. Phipps's previous alleged admissions are unreliable. Any evidence or testimony regarding nolo contendere pleas must be excluded under Penal Code section 1016, Evidence Code section 352, and supporting case law.[10]

4. The Dental Board's findings in the most recent disciplinary proceeding are inherently unreliable to prove Phipps intentionally molested Marie Y., both because of the lower standard of proof in administrative hearings and because licensure statutes are interpreted broadly to protect the public.

5. The judgment is valid against the partnership as well as Phipps. As a partner of Family Dentists of Roseville, Phipps is liable for the negligence of its employees under the "captain of the ship" doctrine and respondeat superior.

6. Section 533 does not preclude coverage or a duty to defend on the facts of this case. The statute does not preclude coverage for negligent acts of the

---

[10] Penal Code section 1016, subdivision 3, provides in part as to nolo contendere pleas: "The legal effect of such a plea, *to a crime punishable as a felony,* shall be the same as that of a plea of guilty for all purposes. *In cases other than those punishable as felonies, the plea and any admissions required by the court during any inquiry it makes as to the voluntariness of, and factual basis for, the plea may not be used against the defendant as an admission in any civil suit based upon or growing out of the act upon which the criminal prosecution is based."* (Italics added.)

insured's agents. The chairside assistants' negligence and liability therefore do not "arise out of" Phipps's alleged willful violation of statute. General Star has failed to prove that the incident did not arise out of or constitute the rendering of professional services.

*General Star's reply*

General Star asserted: (1) Marie Y. had not rebutted General Star's showing that the molestation (which could be proved in these proceedings with all the evidence General Star had adduced) was not a "dental incident" under the policy. (2) The Dental Board's findings collaterally estopped Marie Y. because she brought this action as Phipps's representative and therefore stood in his shoes for all purposes, the factual issues in the Board's proceedings and in this action were identical, and the record of the Board's proceedings established the reliability of its findings. (3) The chairside assistants' negligence did not create coverage because public policy precludes offsetting one person's intentional wrongdoing by another's negligence, and because Phipps's "vicarious" liability was predicated on his own improper supervision, not the assistants' acts or omissions. (4) Marie Y. had not shown any ground for coverage based on the partnership's alleged liability. (5) Even if Phipps's conduct constituted a "dental incident" under the policy, exclusion (h) would bar coverage. (6) The judgment in the underlying action did not bind General Star as to issues not necessarily determined there (i.e., coverage questions).

*The trial court's ruling*

The trial court (Judge John Lewis presiding) denied General Star's motion on the ground that the amended complaints' allegations of chairside assistants' negligence created potential vicarious liability for Phipps, thus raising a triable issue whether General Star had a duty to defend after Phipps tendered the amended complaints to it.

*Marie Y.'s motion for summary adjudication*

General Star moved to amend its answer to add the affirmative defense that Phipps materially misrepresented his history of sexual misconduct when applying to General Star for insurance. Judge Lewis denied the motion.

Marie Y. then moved for summary adjudication of four issues: General Star's breach of its duty to defend; General Star's liability to Marie Y. for the judgment in the underlying action; General Star's duty to indemnify Marie Y. for the full amount of the judgment because it refused reasonable settlement offers within policy limits; and the inapplicability of section 533 to preclude indemnity.

Judge Lewis granted Marie Y.'s motion on all four issues. Judge Lewis found: (1) General Star had a duty to defend once it learned of the amended complaints' allegations against the chairside assistants and the assistants' deposition testimony substantiating those allegations; (2) General Star breached that duty; (3) General Star's refusal to defend and to accept reasonable settlement offers rendered it liable for the entire judgment against its insured; (4) section 533 did not preclude vicarious liability in this case; and (5) Marie Y. and Phipps did not litigate the underlying action collusively.

*The trial of the bad faith claims*

Following Judge Lewis's summary adjudication order, Judge Anthony DeCristoforo conducted an eight-day court trial of Marie Y.'s bad faith claims. Marie Y. contended General Star acted in bad faith, disregarding its insured's interests, in that it failed to consider potential grounds for coverage ascertainable from the amended complaints, failed to investigate the facts thoroughly, and refused reasonable settlement offers within policy limits. General Star, though conceding for the moment (under the compulsion of Judge Lewis's ruling) that its withdrawal of a defense was wrongful, maintained all its acts were reasonable and done in good faith.

After considering the evidence and the parties' briefs, Judge DeCristoforo issued a statement of decision which reads in part as follows:

"The Court finds that General Star did not breach the implied covenant of good faith and fair dealing in its handling of claims made following the alleged sexual battery giving rise to this litigation....

"Judge Lewis, in ruling on Plaintiffs' Motion for Summary Adjudication, already determined that General Star owes the entire amount of the underlying $1,032,276 judgment in Plaintiffs' favor. Accordingly, Plaintiffs are entitled to $1,032,276.00 for the judgment, plus $19,550.53 in costs awarded in the underlying action, minus a $45,000.00 credit for the amount recovered by the Plaintiffs from David Phipps' co-defendants, for a total of $1,006,826.53, plus post-judgment interest at 10% per annum from September 16, 1997, the date specified by the judgment in the underlying action. In light of Judge Lewis' finding that a duty to defend was present, General Star is also liable for unpaid attorney's fees in the defense of the underlying action, which amount to $3,858.62 for services rendered by Robert Zaro and $19,230.00 for work performed by Frank Ferris, for a total of $23,088.62. General Star has stipulated that Plaintiffs are entitled to prejudgment interest on the defense costs from September 16, 1997, the date the trial of the underlying action was completed.

"Nonetheless, after considering the evidence presented at trial as well as post-trial briefing, the Court does not believe that General Star's conduct was

unreasonable so as to give rise to additional bad faith. Although failure to provide a defense automatically renders a carrier like General Star liable for the entire judgment if it is later determined, as Judge Lewis found, that a defense should indeed have been forthcoming [citation], that does not necessarily mean that the covenant of good faith and fair dealing has been breached. An erroneous failure to extend policy benefits constitutes bad faith only if such refusal was unreasonable. [Citations.]

"General Star's initial withdrawal of defense was not unreasonable in light of the allegations made in Plaintiffs' original complaint and the results of General Star's investigation into those allegations. No compelling authority has been identified that precludes an insurance carrier, as part of its investigation, from considering a misdemeanor *nolo contendere* plea to two counts of sexual battery under *Penal Code* § 243.4(d) in determining whether to deny coverage, especially where, as here, there was other evidence supporting the company's decision to deny the defense.

"The novel theory of liability ultimately adopted by Judge Virga in the underlying liability action was not presented by anyone prior to the day of trial of that case. The theory that the chair sides [*sic*] might be negligent for failing to stop Dr. Phipps from sexually molesting a patient, which negligence could thereupon be imputed back to Dr. Phipps himself and thereby provide him coverage for his own intentional misconduct, was a theory not previously advanced by Phipps' own coverage counsel, Craig Farmer, nor his defense attorneys, Robert Zaro and Frank Ferris. Nor was it a theory recognized by General Star's coverage counsel, Blaise Curet. Nor was it a theory given much credence, even in retrospection, by Judge Lewis who characterized it as a 'slim thread of potential coverage.' Failure to weave a warm and fuzzy blanket of insurance coverage from a 'slim thread' can hardly be deemed an unreasonable decision and an act of bad faith.

"Further, the fact that everyone who looked at the conduct of Dr. Phipps and all the surroundings [*sic*] circumstances did not recognize this novel theory until long after coverage decisions had been made should come as no surprise in light of California law which precludes the recharacterization of intentional sexual misconduct in negligence terms so as to trigger insurance coverage. [Citations.] California law also indicates that negligence claims cannot give rise to coverage where such claim [*sic*] are 'inseparably intertwined' with allegations of sexual misconduct [citation], and here any damage from the chair side assistants' alleged conduct occurred virtually simultaneously with the purported sexual battery itself. Where there is a genuine issue as to an insurer's liability under California law, bad faith liability cannot be imposed. [Citation.] It therefore follows that no additional investigation by General Star would have revealed any additional pertinent information that should have reasonably affected it [*sic*] decisions.

"In view of the Court's findings that General Star did not act in bad faith, Plaintiffs cannot recover attorney's fees and costs incurred to obtain benefits due under the General Star policy pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]."

Judge DeCristoforo thereafter entered judgment for Marie Y. "for the sum of $1,029,915.15, plus prejudgment interest at the rate of ten percent ... per annum from September 16, 1997 through June 14, 2001, in the amount of $385,724.39, plus additional prejudgment interest in the amount of $282.17 per day from June 15, 2001 until entry of judgment, together with costs [to be added to the judgment later]."

*General Star's motion to tax costs*

After the judgment was entered on June 22, 2001, Marie Y. submitted a cost memorandum on June 29, 2001, claiming total costs of $61,206.25.

General Star filed a motion to tax costs on July 11, 2001, asserting that Marie Y. was not entitled to $43,004.08 claimed for retaining and deposing the parties' bad faith experts because she had not prevailed on her bad faith claim; therefore those costs were not "reasonably necessary" under Code of Civil Procedure section 998, subdivision (d).[11] Marie Y. filed opposition to the motion on August 6, 2001.

After a hearing held on August 24, 2001, the trial court granted General Star's motion on September 18, 2001, on the ground that General Star prevailed on the bad faith cause of action—the only matter tried after the section 998 offer that involved the expert witnesses whose costs Marie Y. was seeking. The judgment thus allowed Marie Y. costs in the amount of $18,202.17. Notice of entry of the order was filed on January 30, 2002.

After costs were added to the judgment in the foregoing amounts, General Star filed a timely notice of appeal and Marie Y. filed a timely notice of cross-appeal, contesting the granting of the motion to tax costs.

---

[11] That section provides that a defendant who declines a settlement offer and then fails to obtain a more favorable judgment or award may be required to pay the costs of expert witnesses "actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff," as well as the plaintiff's costs. The basis for the motion was that Marie Y. made a section 998 offer to General Star on September 6, 2000, just before the trial of the underlying action, for $1,315,840, an amount greater than Marie Y. won at trial.

## DISCUSSION

### GENERAL STAR'S APPEAL

General Star contends it never had a duty to defend or indemnify Phipps. As we shall explain, General Star never had a duty to indemnify Phipps but did breach a contractual promise to defend him.

### I

*Standard of Review of Summary Adjudication*

■ Summary judgment is properly granted to a defendant who shows without rebuttal that an element of the plaintiff's cause of action cannot be established or that an affirmative defense bars recovery. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) Summary adjudication is properly granted only if a motion therefore completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty. (Code Civ. Proc., § 437c, subd. (f)(1).) We review rulings on motions for summary judgment and summary adjudication de novo, applying the same rules and procedures. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].)

"A motion for summary judgment must be granted if all of the papers submitted show 'there is no triable issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law. In determining whether the papers show ... there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, ... and all inferences reasonably deducible from the evidence ....' (§ 437c, subd. (c).) A defendant has met its burden of showing a cause of action has no merit if it 'has shown that one or more elements of the cause of action ... cannot be established, or that there is a complete defense to that cause of action. Once the defendant ... has met that burden, the burden shifts to the plaintiff ... to show ... a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff ... may not rely upon the mere allegations or denials of its pleading to show ... a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists ....' (*Id.*, subd. (o)(2); *Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456, 464 & fn. 4 [63 Cal.Rptr.2d 291, 936 P.2d 70].) The trial court's summary judgment rulings are subject to de novo review. (*580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 14 [272 Cal.Rptr. 227].)" (*Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 69 [81 Cal.Rptr.2d 360].)

Although the rival motions for summary judgment or summary adjudication were not filed simultaneously, they functioned in effect as cross-motions on essentially undisputed facts. Therefore we consider them together.

## II

*General Relevant Principles of Insurance Law*

" '[I]nterpretation of an insurance policy is a question of law.' (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU Ins.*).) If possible, we infer this intent solely from the written provisions of the insurance policy. (See *id.* at p. 822.) If the policy language 'is clear and explicit, it governs.' (*Bank of the West, supra,* 2 Cal.4th at p. 1264.)

"When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," ' unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' (*AIU Ins., supra,* 51 Cal.3d at p. 822, quoting Civ. Code, § 1644.) We must also interpret these terms 'in context' (*Bank of the West, supra,* 2 Cal.4th at p. 1265), and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' (Civ. Code, § 1641; see also *Holz Rubber Co., Inc.* v. *American Star Ins. Co.* (1975) 14 Cal.3d 45, 56 [120 Cal.Rptr. 415, 533 P.2d 1055].)" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].)

■ In most policies of insurance, the insurer agrees to defend an insured against any claim for which the policy affords coverage. (See, e.g. *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 38–41 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) In such a situation, an insurer's duty to defend is broader than its duty to indemnify. The duty to defend exists if there is any potential for coverage under the policy, while the duty to indemnify exists only if the insured's conduct is actually covered. Whether a duty to defend exists is initially determined by comparing the allegations of the complaint with the terms of the policy; however, facts extrinsic to the complaint can either give rise to or defeat the duty. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295–299 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).) Where any of a plaintiff's claims is potentially

covered, the insurer has a duty to defend the action in its entirety; where none is potentially covered, the insurer has no duty to defend. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 47 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*).)

█ However, an insurer, in its contract, may agree to defend an insured against claims for which there is no coverage. (See, e.g. *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 506–509 [78 Cal.Rptr.2d 142].) In such a case, whether there is a duty to defend depends upon the language of the insurance contract and whether it created an objectively reasonable expectation on the part of the insured that a defense would be provided in the circumstances. (*Id.* at p. 509.)

III

ANALYSIS

A.

*The Original Complaint*

1. *General Star had no duty to indemnify Phipps while the original complaint was operative.*

As we now show, General Star did not incur a duty to defend or indemnify Phipps at any time when the original complaint was operative. Both the express terms of Phipps's policy and section 533 precluded coverage for his willful sexual misconduct, and General Star did not agree to defend him in the circumstances then known to them.

As noted, Phipps's policy provides coverage for "any claim that is first made against the insured arising out of a *dental incident*"—which, in turn, means "any act, error, omission, or mistake in the rendering of or failure to render services in the profession of dentistry by an insured or any person for whose acts or omissions an insured is legally liable." (Italics added; capitalization omitted.) The "profession of dentistry" means "services performed in the practice of the profession of dentistry as defined in the business and the professional codes of the state where you practice."

Marie Y. points out that the expression "arising out of" in an insurance policy must be construed broadly, especially when it appears in the coverage section of the policy. (See, e.g., *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764] [coverage language construed broadly]; *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328 [81 Cal.Rptr.2d 557] (*Acceptance*).) The expression

"does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Acceptance, supra,* 69 Cal.App.4th at p. 328.) However, this still leaves the question whether the original complaint alleged that Marie Y.'s injury arose out of *a dental incident*. The answer is no.

A dental incident within the meaning of the policy necessarily entails "the rendering of or failure to render *services in the profession of dentistry,*" as that profession is defined by the applicable statutes of the state where the dentist practices. (Italics added.) Such service must involve "the diagnosis or treatment … of diseases and lesions and the correction of malpositions of the human teeth, alveolar process, gums, jaws, or associated structures[, including] all necessary related procedures as well as the use of drugs, anesthetic agents, and physical evaluation." (Bus. & Prof. Code, § 1625.) However, it cannot involve "[t]he commission of any act of sexual abuse, misconduct, or relations with a patient" (Bus. & Prof. Code, § 726) or "[t]he committing of any act or acts of gross immorality substantially related to the practice of dentistry" (Bus. & Prof. Code, § 1680, subd. (e)), because such acts by dentists constitute "unprofessional conduct" and grounds for disciplinary action. (*Ibid.*; see also Bus. & Prof. Code, § 1670.1 [crimes "substantially related to the qualifications, functions, or duties of a dentist"].)

Marie Y.'s original complaint in the underlying action, even in its negligence count, specifically alleged that Phipps engaged in sexual abuse and sexual misconduct toward Marie Y. and that his behavior was "*unprofessional and totally void of a legitimate diagnostic motive.*" (Italics added.) Such behavior, even if performed during a dental procedure which included "the use of drugs [and] anesthetic agents" (Bus. & Prof. Code, § 1625), cannot reasonably be construed as "rendering … services in the profession of dentistry" within the meaning of Phipps's policy. Therefore, his alleged acts cannot be considered a "dental incident" covered by the policy, or "arising out of" such an incident.

Indemnification of Phipps, based on the allegations of the original complaint, was also barred by section 533.

Section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." (See fn. 2, p. 933, *ante.*) ■ Section 533 creates a statutory exclusion which is read into every insurance policy. (*J.C. Penney Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1019 [278 Cal.Rptr. 64, 804 P.2d 689] (*J.C. Penney*).) A policy cannot provide coverage for acts excluded by section 533; therefore a contractual

exclusionary clause cannot be construed more narrowly in favor of coverage than section 533. (*J.C. Penney*, at pp. 1019–1020, fn. 8; *Jacobs v. Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1269, fn. 7 [42 Cal.Rptr.2d 906] (*Jacobs*).) "The public policy underlying section 533 is to discourage willful torts. [Citations.]" (*J.C. Penney, supra,* 52 Cal.3d at p. 1021.)

■ "[W]ilful act" as used in the statute means more than an intentional act done with ordinary or gross negligence—it connotes wrongfulness or misconduct. (*J.C. Penney, supra,* 52 Cal.3d 1009, 1020–1021; *Jacobs, supra,* 36 Cal.App.4th 1258, 1269.) Conduct may be wrongful because the actor intended harm or because the act is inherently harmful regardless of intent. (*J.C. Penney, supra,* 52 Cal.3d at p. 1025.)

■ Sexual molestation is a "wilful act" under the statute. (*J.C. Penney, supra,* 52 Cal.3d 1009, 1025–1026.) "There is no such thing as negligent or even reckless sexual molestation." (*Id.* at p. 1021.) Sexual harassment is also a willful act. (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1602 [18 Cal.Rptr.2d 692] (*Coit*).) So is nonconsensual sexual assault against a 17-year-old minor. (*Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th 478, 502 [citing *State Farm Fire & Cas. Co. v. Ezrin* (N.D.Cal. 1991) 764 F.Supp. 153, 155–157].) So is public "nonsexual" misconduct by a teacher against a student which is part of a design to foster private sexual molestation. (*Horace Mann Ins. Co. v. Barbara B.* (1998) 61 Cal.App.4th 158, 167 [71 Cal.Rptr.2d 350] (*Horace Mann*).)

■ In light of these precedents, sexually molesting a dental patient after rendering her unable to resist by giving her nitrous oxide is a "wilful act" under section 533. Such conduct is at least as heinous as the noncriminal sexual harassment committed by the adult plaintiff's employer in *Coit, supra,* 14 Cal.App.4th 1595. As this is the precise conduct originally alleged against Phipps, the original complaint on its face demonstrates that section 533 bars coverage for his conduct.

It is immaterial under section 533 that Marie Y. pleaded Phipps's intentional misconduct in the alternative as negligent.[12] "We are required to interpret section 533 so as to give effect and meaning to all its provisions; just as we cannot allow insurers to recharacterize negligent conduct as

---

[12] Marie Y. appears to assert that in paragraphs nine through 11 of the first cause of action in her second amended complaint she alleged Phipps was negligent in part because he failed to take care, when "jostling her to awaken her from the effects of nitrous oxide," that she did not misperceive his touchings. Marie Y. is mistaken. Neither at the cited paragraphs nor anywhere else does the second amended complaint contain such allegations. The only record cite Marie Y. gives is to Judge Virga's ruling after trial in the underlying action, in which Phipps testified to that effect.

intentional, we cannot allow the insured to recast intentional conduct as merely negligent." (*Coit, supra,* 14 Cal.App.4th 1595, 1609.)

The parties dispute whether General Star could properly use Phipps's *misdemeanor* nolo contendere plea to sexual battery as a ground for denying coverage or a defense to the original complaint. General Star points out that a misdemeanor nolo contendere plea is a conclusive adjudication of guilt in the criminal justice system. (Pen. Code, § 1016, subd. 3.) Marie Y. points out that, unlike a *felony* nolo contendere plea, a *misdemeanor* nolo contendere plea cannot be used as an admission in a civil suit. (*Ibid.*; see *County of Los Angeles v. Civil Service Com.* (1995) 39 Cal.App.4th 620, 627–632 [46 Cal.Rptr.2d 256] [administrative proceedings where no specific statute permits use of plea; insurance coverage not discussed]; compare *Century-National Ins. Co. v. Glenn* (2001) 86 Cal.App.4th 1392, 1397 [104 Cal.Rptr.2d 73]; *Interinsurance Exchange v. Flores* (1996) 45 Cal.App.4th 661, 672–673 [53 Cal.Rptr.2d 18] [*felony* nolo contendere pleas usable by insurer to deny defense].)

We need not decide this question. First, as we have explained, General Star properly concluded there was no coverage under the original complaint because it did not allege any conduct by Phipps arising out of a "dental incident." Second, by alleging conduct which fell within section 533, the complaint necessarily alleged conduct for which coverage is precluded by law. Third, by the time Phipps tendered Marie Y.'s amended complaint (alleging the assistants' negligence) to General Star, there was further proof that Phipps committed a "wilful act" precluding a finding he committed a "dental accident" and barring coverage under section 533: the Dental Board's factual and legal findings that he committed acts of sexual abuse and sexual misconduct because he molested Marie Y. "There is no such thing as negligent or even reckless sexual molestation." (*J.C. Penney, supra,* 52 Cal.3d 1009, 1021.)

The Dental Board made its findings before Marie Y. served her first amended complaint, and General Star was entitled to rely on them in refusing coverage. Moreover, by the time Marie Y. filed the present action, the Dental Board's findings and decision had become final. As we shall explain, the Dental Board's findings that Phipps molested Marie Y. collaterally estops her now, as Phipps's assignee, from asserting that his conduct was merely negligent.

When an administrative agency acts in a judicial capacity to resolve disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, its decision will collaterally estop a party to

the proceeding from relitigating those issues. (*People v. Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321] (*Sims*).) We conclude the *Sims* rule applies here.

The Dental Board held an adversary proceeding on the accusations against Phipps, presided over by an ALJ. As required by statute (Bus. & Prof. Code, § 1670; Gov. Code, § 11500, subd. (f)), the Dental Board's proceeding was judicial in nature: Phipps and the accuser, represented by counsel, called witnesses who testified under oath, subject to cross-examination, at a transcribed hearing, and deposition and discovery were available to both parties. The factual issue in the proceeding—whether Phipps's inappropriate touchings of Marie Y. were intentional and sexually motivated—is identical to the core issue in the present action. Phipps had every opportunity to litigate that issue there. After hearing all the evidence, the ALJ produced a formal proposed decision resolving the issue adversely to Phipps. The Dental Board adopted that decision. Its proceeding satisfied all the *Sims* criteria for collateral estoppel. (See *Sims, supra,* 32 Cal.3d 468, 479–482.) Thus, its findings of sexual abuse and misconduct have collateral estoppel effect.

■ Collateral estoppel applies not only to parties to an action or proceeding, but also to those in privity with the parties. (*Sims, supra,* 32 Cal.3d 468, 484.) Here, Marie Y. has brought suit as Phipps's assignee. As such, she "stands in [his] shoes" for all purposes, possessing all his rights against General Star, but subject to all defenses General Star could have raised against him. (*Smith v. State Farm Mut. Auto. Ins. Co.* (1992) 5 Cal.App.4th 1104, 1110–1111 [7 Cal.Rptr.2d 131]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 948, p. 844.) Thus, she is in privity with Phipps for purposes of collateral estoppel. Because the Dental Board's decision would estop Phipps to deny his molestation was intentional (and hence precluded from coverage under section 533), it likewise estops Marie Y. as his assignee.

*Conclusion*

■ For all the above reasons, General Star never incurred a duty to indemnify Phipps based on the allegations in the original complaint. Put differently, there was no coverage, nor potential for coverage, under the original complaint.

2. *General Star had no duty to defend Phipps under the original complaint.*

Because there was no coverage, nor potential for coverage under the allegations of the original complaint, and the extrinsic facts then known to General Star, the insurer had no duty to defendant Phipps under the general

defense obligation to defend Phipps against a claim for damages "because of a dental incident, to which this policy applies ...." (*Ante*, at p. 935.) ▮ Where there is no potential for coverage, there is no duty to defend. (*Buss, supra,* 16 Cal.4th 35, 47; *Montrose, supra,* 6 Cal.4th 287, 295–299.)

Nor was there a duty to defend under exclusion (h), which provides: "This insurance does not apply: [¶] ... [¶]

"(h) to liability for any damages arising out of a dental incident which is also a willful violation of a statute, ordinance or regulation imposing criminal penalties; however;

"(1) we will defend any civil suit against the insured seeking amounts which would be covered if this exclusion did not apply; and

"(2) in such case we will pay only the fees, costs, and expenses of such defense; any payment made under this provision will reduce the limits of insurance by the amount of such payment." (Capitalization and bolding omitted.)

In removing the criminal-penalty exclusion for the purpose of promising a defense, this language refers to "amounts which would be covered if this exclusion did not apply." This latter language necessarily then requires resort to the basic coverage provision of the policy, in order to determine "amounts which would be covered." That basic coverage provision, in turn, requires that there has been a "dental incident," as we have discussed.

Because neither the original complaint nor the extrinsic evidence then known to General Star suggested a "dental incident" had occurred, there was no duty to defend under this policy provision.

It is immaterial to General Star's duty to defend that Marie Y. ultimately obtained a negligence judgment against Phipps. ▮ An insurer that has reserved its right to assert noncoverage is not bound by a judgment against the insured. (*J.C. Penney, supra,* 52 Cal.3d 1009, 1017; *Horace Mann, supra,* 61 Cal.App.4th 158, 165.) Thus, where an insurer has reserved its right to deny coverage, an underlying judgment in litigation between the insured and a third-party plaintiff to which the insurer was not a party does not collaterally estop the insurer from asserting that the insured's conduct was intentional rather than negligent. (*J.C. Penney, supra,* 52 Cal.3d at p. 1017; *Horace Mann, supra,* 61 Cal.App.4th at p. 165.) General Star repeatedly and forcefully denied coverage in this case.

B.

*The Effect of the Amended Complaints*

Marie Y. contends General Star breached its duty to defend by refusing to reinstate its defense after Phipps tendered Marie Y.'s amended complaints, which suggested the possibility of vicarious liability for the chairside assistants' negligence. We agree.

For reasons we have explained, General Star had no obligation to defend or indemnify Phipps based on his personal conduct as alleged in the amended complaints.

However, as we have noted, on June 26, 1996, Phipps's counsel tendered to General Star Marie Y.'s first amended complaint that alleged, "A chairside assistant, KIMBERLY ALTENBERG [*sic*], who was an agent and employee of FDR [Family Dentists of Roseville], observed … PHIPPS … sexually touching MARIE Y. during the course of dental treatment, and did nothing to stop him; nor did she immediately report the incident or seek aid from defendant SHOREY, who was present in another operatory of the same office, in order to safeguard the plaintiff."

Plaintiffs have contended that this pleading invoked coverage, or at least the potential for coverage, on two theories: (1) Phipps could be liable as the "captain of the ship" (see fn. 9, p. 942, *ante*); or (2) as a partner in Family Dentists of Roseville, Phipps would be liable on a theory of respondeat superior for the negligence of the dental assistant. (See generally *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003 [47 Cal.Rptr.2d 478, 906 P.2d 440].)

We are of the view that section 533 continued to bar indemnity (or "coverage") based upon the claims involving the dental assistants. As we explain, it would violate the public policy underlying section 533 (which is to discourage willful torts) to create coverage for Phipps based on the assistants' conduct, because their "negligence" was inextricably intertwined with Phipps's intentional wrongdoing and Marie Y.'s resulting harm.

A "theory of liability …, and an insurer's duty to defend and indemnify therefor, [which] would … only flow from, and be inseparable from, an intentional and willful act … for which coverage is legally barred" (*Coit, supra*, 14 Cal.App.4th 1595, 1605) is untenable. Thus, where harm is alleged to result from negligent conduct which is "so intertwined with [intentional and willful wrongdoing] as to be inseparable [from the wrongdoing]" the alleged negligence does not give rise to an insurer's duty to indemnify. (*Ibid.*)

The assistants' alleged negligence harmed Marie Y., if at all, only as "part and parcel of [Phipps's] design" to commit misconduct. (See *Horace Mann, supra*, 61 Cal.App.4th 158, 167.) Their negligence consisted only in failing to stop him from continuing the molestation he had already begun. Without Phipps's acts of molestation, there was nothing wrongful for the assistants to report. This, in and of itself, shows that the negligence of the assistants was inextricably intertwined with Phipps's molestation.

Moreover, according to Marie Y.'s amended complaint, Fisch saw the molestation in progress before committing any allegedly negligent act or omission. According to the assistants' testimony, Phipps sent Fisch out of the room on an errand before beginning to touch Marie Y. inappropriately, and immediately stopped when Fisch returned; then, after sending her out of the room again on another errand, he resumed his misconduct as Stevens, alerted by Fisch, looked on without intervening.

Obviously, Phipps intended and counted on such "negligence" by the assistants to facilitate his design. As such, it was inextricably intertwined with that design, and any harm it caused was inseparable from Phipps's willful misconduct. (See *Coit, supra*, 14 Cal.App.4th 1595, 1605.) To allow insurance indemnity for vicarious liability on this basis would flout section 533's clear purpose of discouraging willful torts. (*J.C. Penney, supra*, 52 Cal.3d 1009, 1021.)

General Star therefore never had a duty to indemnify Phipps.

It follows that General Star never had an obligation to accept any of Marie Y.'s offers to settle. "From the covenant of good faith and fair dealing implied by law in all contracts, and from the liability insurer's duty to defend and indemnify *covered* claims, California courts have derived an implied duty on the part of the insurer to accept reasonable settlement demands on such claims within the policy limits. [Citation.]" (*Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718, 724 [117 Cal.Rptr.2d 318, 41 P.3d 128], italics added.) ■■ As this passage from *Hamilton* indicates, the insurer has a duty to accept a reasonable settlement offer only with respect to a *covered* claim. It is true that an insurer who refused a reasonable settlement offer, on the ground of no coverage, does so at its own risk, so that the insurer has no defense that its refusal was in good faith if coverage is, in fact, found. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16, 19 [123 Cal.Rptr. 288, 538 P.2d 744].) However, where the *kind* of claim asserted is not covered by the insurance contract (and not simply the *amount* of the claim), an insurer has no obligation to pay money in settlement of a noncovered claim, because "The insurer does not ... insure the entire range of an insured's well-being, outside the scope of and unrelated to the

insurance policy, with respect to paying third party claims. It is an insurer, not a guardian angel." (*Camelot by the Bay Condominium Owners' Assn. v. Scottsdale Ins. Co.* (1994) 27 Cal.App.4th 33, 52 [32 Cal.Rptr.2d 354].) Here, because there was no coverage for the *kind* of claims asserted by Marie Y., General Star had no obligation to accept any of Marie Y.'s offers to settle those claims. (*Id.* at p. 53.) Therefore, to the extent the trial court, in its summary adjudication order, ruled that General Star's refusal to accept Marie Y.'s settlement offers rendered General Star liable for the entire judgment against Phipps, the trial court erred.

This leaves the question whether General Star had a duty to defend Phipps upon its receipt of the first amended complaint even though coverage (indemnity) was precluded by section 533. " '[S]ection 533 precludes only *indemnification* of wilful conduct and not the *defense* of an action in which such conduct is alleged. [Citation.] ... [E]ven though public policy or section 533 precludes an insurer from indemnifying an insured in an underlying action the duty to defend still exists so long as the "insured reasonably expect[s] the policy to cover the types of acts involved in the underlying suit[.]" [Citation.]' (*Republic Indemnity Co. v. Superior Court* (1990) 224 Cal.App.3d 492, 497 [273 Cal.Rptr. 331] ....) Put another way, 'if the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying that claim.' (*Ohio Casualty Ins. Co. v. Hubbard* (1984) 162 Cal.App.3d 939, 947 [208 Cal.Rptr. 806].)" (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 93 [9 Cal.Rptr.2d 894]; followed in *Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th 478, 508–509; *Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 878 [90 Cal.Rptr.2d 721].)

At issue is exclusion (h) of the General Star policy that provides for a defense of a claim arising out of a "dental incident" even though the insured has committed a willful criminal act. (See Discussion, *ante,* at p. 951.) The question is thus posed: Is the failure of a dental assistant to report sexual misconduct by a dentist a "dental incident"?

We conclude it is, on this record, for two reasons.

First, the only evidence on this record is to the effect that the failure of a dental assistant to report sexual misconduct constitutes a breach of the dental assistant's duty of care toward a patient. To pick but one example, the Dental Board required, as a condition of Phipps's prior probation, that a

dental assistant be present to stop his sexual misconduct. This condition of probation, imposed by the Board, recognized that it is within the duty of a dental assistant to report sexual misconduct of a dentist.

Second, the only legal authority cited by General Star is inapposite. Thus, General Star cites the opinion of the Nebraska Supreme Court in *R.W. v. Schrein* (2002) 263 Neb. 708 [642 N.W.2d 505], for the proposition that "the dental assistants' alleged failure to prevent the assault does not constitute a professional service ...." However, General Star has failed to report that the cited opinion was later modified by the Nebraska Supreme Court to delete the portion of the opinion upon which General Star relies. (*R.W. v. Schrein* (2002) 264 Neb. 818, 822 [652 N.W.2d 574].)

Faced with an undisputed record and with no contrary authority, we conclude the dental assistants' failure to report Phipps's misconduct constituted a "dental incident" within the meaning of the policy. The policy promised coverage for a dental incident "in the practice of the profession of dentistry by the insured *or by any person for whose acts or omissions the insured is legally responsible.*" (See p. 935, *ante*, italics added.) This language would include Phipps's responsibility for the acts of the dental assistants. Even assuming Phipps had committed a willful criminal act, and even though indemnity was barred by section 533, Phipps could objectively and reasonably expect a defense under exclusion (h), which promised him a defense even though he had committed a willful criminal act. (See p. 957, *ante*; *Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th 478, 509.) In the trial court, General Star argued the allegations of the conduct of the dental assistants in the first amended complaint provided no arguable basis for coverage *under the language of the policy*, and therefore no duty to defend Phipps under exclusion (h), because the dental assistants had not been named as parties in Marie Y.'s action. The argument is not well taken. General Star knew that Phipps was a partner in Family Dentists of Roseville and was therefore an employer of the dental assistants. "A plaintiff seeking to hold an employer liable for injuries caused by employees acting within the scope of their employment is not required to name or join the employees as defendants." (*Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817, 820 [9 Cal.Rptr.2d 258], and cases cited.)

General Star breached its duty of defense (but not its duty to indemnify) when, on July 16, 1996, after it had received the first amended complaint, it refused to defend Phipps.

This leaves the question of damages to which Phipps (and his assignee, Marie Y.) are entitled. ▮▮▮ Where an insurer is liable for breach of contract to defend (but not indemnify) an insured, and where the insurer is

*not* guilty of tortious bad faith, and where the insured in fact retains counsel to defend the claim, the proper measure of damages is the reasonable attorneys' fees and costs incurred by the insured in defense of the claim. (*Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 564–566 [91 Cal.Rptr. 153, 476 P.2d 825]; *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1793–1794 [23 Cal.Rptr.2d 73], limited by *Amato v. Mercury Casualty Co.* (1997) 53 Cal.App.4th 825, 831 [61 Cal.Rptr.2d 909].) This is the proper measure of damages in this case.[13]

Marie Y. relies upon authorities standing for the proposition that where an insurer receives notice of the pendency of an action, and wrongfully refuses to defend its insured, the insurer is bound by the judgment against its insured. (See, e.g., *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 237 [178 Cal.Rptr. 343, 636 P.2d 32]; *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 884 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 515 [42 Cal.Rptr.2d 295].) However, in none of these cases was indemnification of the insured barred by section 533. To allow Phipps to recover damages amounting to indemnity for his willful acts would contravene the strong policies underlying section 533, which we have discussed.

Marie Y. also contends General Star should be liable for the full amount of the judgment because it breached its duty to settle Marie Y.'s claim against Phipps. However, as we have explained, General Star had no duty to settle the claim by paying its own funds.

In the circumstances of this case, we are confident that the proper measure of damages is that described in *Hogan v. Midland National Ins. Co., supra,* 3 Cal.3d 553, 564–566. To the extent the trial court, in its summary adjudication order, held General Star liable for the whole Marie Y. judgment because General Star had refused to defend Phipps, the trial court erred.

We are mindful of the command of Article VI, section 13 of our Constitution that, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Having reviewed the whole record in this case, we have no doubt whatsoever that this constitutional test has been satisfied.

---

[13] Neither side has briefed the question whether Marie Y.'s damages may be limited to the policy limit of $200,000, pursuant to application of exclusion (h), and we express no view on that issue.

We shall remand to the trial court for a redetermination of Marie Y.'s damages, which shall be the reasonable attorneys' fees and costs incurred by Phipps in defending the Marie Y. action after July 16, 1996.

## MARIE Y.'S CROSS-APPEAL

Marie Y. cross-appeals, contending the trial court erred in granting General Star's motion to tax costs, thereby denying Marie Y. some $43,000 in expert witness fees. Marie Y. argues that the judgment, in the amount of $1,415,639.54 was $99,799.54 more than General Star's statutory offer to settle, made pursuant to Code of Civil Procedure section 998.

Our reversal of the judgment, which includes a reversal of the cost award, moots this claim. The trial court will have to reassess and recompute costs on remand.

## DISPOSITION

The judgment in the present action is reversed and the matter is remanded for a redetermination of Marie Y.'s damages and costs in accordance with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a)(3).)

Raye, J., and Morrison, J., concurred.

A petition for a rehearing was denied August 14, 2003, and the petition of plaintiffs and appellants for review by the Supreme Court was denied October 15, 2003. Baxter, J., did not participate therein.